PAUL H. HARRIS AND FRANCES A. HARRIS, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent.
Harris v. Commissioner
Docket No. 3795-82.
United States Tax Court
T.C. Memo 1986-105; 1986 Tax Ct. Memo LEXIS 502; 51 T.C.M. (CCH) 635; T.C.M. (RIA) 86105; March 18, 1986. Herman Wolff, Jr., for the petitioners. Frank D. Armstrong, Jr., for the respondent. SHIELDS
MEMORANDUM FINDINGS OF FACT AND OPINION SHIELDS, Judge: Respondent determined a deficiency in the income tax due from petitioners' for 1979 in the amount of $2,424. After concessions, the issues remaining for decision are: (1) whether petitioner, Paul H. Harris, was engaged in carrying on a business of farming and/or breaking bird dogs for profit during 1979; and (2) if so, the amount of deductible expenses incurred in connection with such business. FINDINGS OF FACT Some of the facts have been stipulated. The stipulation of facts *504 and exhibits attached thereto are incorporated herein by reference. Petitioners, Paul H. and Frances A. Harris, husband and wife, lived on a farm in Granville County, North Carolina during 1979 and at the time their petition was filed in this case. They timely filed a joint income tax return for 1979 with the Internal Revenue Service Center, Memphis, Tennessee. During 1979, and for about 24 years prior thereto, Paul H. Harris was employed by Mount Hope Finishing Company, a knitting mill. By the end of 1979, Mrs. Harris had been employed for about 13 years by the State of North Carolina at the Murdock Center for the Retarded. Both places of employment were located in Butner, which is about 17 miles from the rural farming community in which petitioners have lived all their married life. In fact, Mr. Harris was born in the same community in 1929 and has lived there all his life. His father owned and operated a farm throughout his life, and his two brothers and his adult son are also farmers. As a child Mr. Harris did not enjoy attending school.He preferred to be on the family farm hoeing cotton, milking cows, or working in the saw mill, and most of the time he was permitted *505 to do so by his father. Consequently, Mr. Harris' formal education suffered, but he gained practical knowledge and experience with respect to land, animals, buildings, equipment, and farming generally. For 15 to 20 years prior to 1979, Mr. Harris had been engaged in part time farming and petitioners had reported such farming activities on their income tax returns. To the best of petitioner's recollection there had been little, if any, net profit reported from such operations. When he was about 15 to 16 years old, Mr. Harris began to hunt quail with an older man in the community. He soon developed a love for such activities and particularly for the pointer and setter dogs which are used to locate the birds. He also discovered and was frequently told by other dog owners that he had an unusual knack or skill for handling such dogs. However, prior to sometime in 1977, he had not attempted to operate a business of training or breaking dogs for others. Prior to this time he had been content with training a dog or two of his own. In 1977 Mr. Harris concluded that he could realize a profit by breaking dogs for other people during the fall and early winter part of each year when his *506 farming activities were at a minimum. At the trial he explained that the process of breaking dogs was considerably different from breeding, raising, or even the general training of dogs. According to his testimony, in the breaking process he had possession of each dog for only about two to four weeks. The actual breaking process consisted of taking a fully developed, mature bird dog and bringing it under the control of the handler. Mr. Harris stated that when placed down in a field or other likely place for birds, a mature bird dog by instinct and breeding knows how to use his senses of smell, sight and hearing to find quail. Mr. Harris also stated that the quail by their own instinct prefer to walk or, if pressed, to "freeze" (become completely immobile) rather than to fly. The "breaking of the dog" is to bring him under control to the point where he hunts for the handler rather than for himself. A fully broken dog, therefore, is one which is under the control of the handler at all times. On command by voice or hand signal from the handler such a dog stops, starts, moves farther out, comes closer in, slows down, speeds up, or goes in a different direction. The dog is also trained *507 (broken) to run a "course" which means he works or covers a field in decreasing circles carefully checking all the "birdy" spots. In addition, the dog maintains contact with the handler by frequently "checking back" (looking in the handler's direction or coming closer if necessary) in order to get further instructions. Even more importantly, when the dog strikes the scent of a covey (or even a single bird) he does not charge in and flush the birds, but instead creeps ever so slowly forward until they freeze. When the birds freeze, the dog also freezes "on point" and holds the birds in place until the hunter moves forward to flush the covey and shoot. At this point, which is known as "wing and shot" some dogs are trained to go forward immediately and retrieve any dead birds, while other dogs are trained to hold steady beyond wing and shot until told by the handler to "seek dead." At any one time during September through December of 1977, 1978, and 1979, Mr. Harris was in the process of breaking about three or four dogs for a total of about twelve dogs per year. He charged the owner of each dog about $30. During the process he kept the dogs at his place and fed them, and for *508 use in their training he purchased about 150 quail per year. He also purchased quail feed, dog feed, and automatic feeders. He also built and maintained recapture cages or small pens which were used to enclose the birds until they had formed coveys or groups of about 10 to 15 birds. The feeders were used throughout the process so as to keep the coveys at or near the original sites of the pens which were scattered at about five different points on Mr. Harris' farm. By keeping each covey of birds at or near its feeder or pen, Mr. Harris could readily find the coveys without any substantial delay. In this manner he could work about three or four dogs per day. He averaged at least twenty hours per week with the dogs during the fall. In order to avoid delay, he also regularly used a horse and saddle to go from covey to covey. Being on horseback not only permitted him to move more quickly and with less energy, but it also placed him in a better position to observe the movements of the dog and the birds. In order to gain control over particularly stubborn dogs, he acquired and used an electronic collar. Over the years, Mr. Harris attended several field trials for bird dogs and on *509 occasion entered a dog in such trials. While attending field trials he observed the manner in which other people handled their dogs and discussed the breaking of bird dogs with other owners and handlers. On the joint returns for 1977, 1978, and 1979 Mr. Harris reported gross income, expenses, and net income (loss) from breaking bird dogs as follows: 1977
1978
1979
Gross Income
$400.00 $280.00 $300.00 Expenses
741.00 1,072.00 1,518.00 Loss
(341.00)
(792.00)
(1,218.00)
For 1979, the year in question, the expenses claimed on the return consisted of the following: Feed
$ 617.00
Veterinarian Expense
10.00
Birds
150.00
Supplies
210.00
Mileage (1,000 at $ .10)
100.00
Depreciation
137.00
Repairs
252.00
Telephone
34.00
Utilities
8.00
TOTAL
$1,518.00
At or about the end of 1979, Mr. Harris decided to, and did, quit breaking bird dogs for other people because he could not make a profit by handling only three or four dogs at a time, and he could not handle more than that while working at the mill and doing his farm chores. In a normal week during 1977, 1978, and 1979, Mr. Harris worked about forty hours *510 at Mount Hope, but the work was irregular and fluctuated with the needs of the mill. In some weeks he worked as little as twenty-three hours and others only three or four days. In the three years prior to trial Mr. Harris had not missed a day of work while the mill was running. On a typical weekday during the farming season (early spring to early fall) he worked from 7:00 a.m. to 3:00 p.m. at the mill. He then worked for the remainder of the day on the farm. At times such days would continue until 10:00, 11:00, or even midnight. During this period, he also worked on the farm during weekends. From some time in September until about January, the farm work slowed down, and during 1977, 1978 and 1979 Mr. Harris spent his afternoons and weekends breaking bird dogs. In 1977 or 1978, [1] petitioners purchased and moved to the farm in Granville County. They bought the farm because Mount Hope Finishing Company does not have a retirement plan for its employees, and Mr. Harris wanted a place where he could make a living when he had "to go out of the mill." *511 The farm cost $40,000 and contains 150 acres. Petitioners also leased an adjoining 10 acres so that the entire operation contained 160 acres. The farm is improved with a residence in which petitioners lived and five out buildings. The out buildings include a pack house used to store corn, a pack house used to store soybeans, two shelters or sheds, and a smoke house. There is also a pig or farrowing house. For depreciation purposes, Mr. Harris allocated $6,000 of the purchase price to the farm buildings. He arrived at this figure by estimating that it represented about one-tenth of their replacement cost. At purchase the farm had a 3,000 pound tobacco allotment, which was worth about 20 cents per pound or $600 per year. Petitioners permitted their son to use the allotment without charge on his farm. During 1979 Mr. Harris had some pigs and planted about 30 acres of soybeans and 20 acres of corn. Mrs. Harris planted and harvested a large family garden at least three times during the year. The garden contained tomatoes, peas, beans, silver queen corn, turnip greens, and other vegetables, many of which were canned, frozen, dried or otherwise stored by Mrs. Harris for later *512 use. During the summer of 1979, Granville County experienced a severe drought which resulted in it being declared a disaster area by the local Agricultural and Stabilization Committee of the Agricultural Department. [2] Petitioners had no irrigation, so during 1979 the soybeans and corn dried up and the pig crop failed except for a few animals which were slaughtered for personal use by petitioners. The loss from the drought was so severe that the owner of the adjoining 10 acres only charged $70 in rent. Although not being able to show a taxable profit, Mr. Harris always intended to make a profit at farming. In an effort to improve his profitability, he frequently discussed different methods and the business of farming with his brothers, his son, and other farmers. In order to perform his farming tasks faster and more efficiently, he bought in 1978 a new second tractor, a 7000 Ford, at a cost of $7,850.In October of 1978 he also purchased an F-100 Ranger pickup truck which was used on the farm and for commuting back and forth to the mill. The net cost of the truck after a trade-in was $5,862. He already *513 owned and kept a 1973 Farmall 140 tractor and various other farm vehicles and equipment. In 1979 he bought other farm equipment which cost $4,106. Petitioners also owned a Ford automobile which was used strictly for personal purposes by Mrs. Harris. In order to store fuel for the equipment, two fuel pumps were maintained on the farm, one for diesel and one for gasoline because the Ford tractor used diesel and the Farmall tractor used gasoline.Neither pump was ever used for personal purposes. On their income tax returns for 1976 through 1979 petitioners reported gross profits and net losses from farming as follows: 1976
1977
1978
1979
Gross Profits
$33.00 $11.00 Net Losses
$ (2,771.00)
(3,657.00)
(5,997.00)
$ (12,138.00)
On the farm schedule of their 1979 return petitioners claimed the following deductions: Item
Amount
Labor Hired
$ 287.00
Repairs
890.00
Interest
3,066.00
Rent
70.00
Farm Seed
10.00
Machine Hire
539.00
Supplies Purchased
1,219.00
Gasoline and Fuel
1,351.00
Taxes
355.00
Measure Land
52.00
Wire
181.00
Depreciation
4,118.00
TOTAL
$12,138.00
At the trial petitioners produced *514 and entered into evidence checks for each of the farm deductions except the deduction for depreciation. They also produced checks for each of the deductions with respect to the breaking of bird dogs except depreciation, the telephone expense of $34, the utility expense of $8, and the mileage expense of $100. All of the checks were written and signed by Mr. Harris and he also determined and placed on each check the purpose for which it was written. At the trial he testified freely and candidly with respect to how the checks were prepared and the purposes for which they were written. The feed checks, however, include three checks totaling $155.35 for hog feed. The checks for labor include three checks totaling $55 which were issued to three individuals for planting tobacco for petitioners' son. In addition to the checks in support of the various deductions claimed on their return for 1979, petitioners also placed into evidence checks for the capital expenditures reflected on the return. In other words, in support of the cost of $7,850 for the 7000 Ford tractor there were two checks, one for $5,000 and one for $2,850. In support of the other farm machinery and equipment purchased *515 during 1979, the record contains seven checks for the $4,106 shown as the total cost of such items on the depreciation schedule. On the farm schedule petitioners claimed depreciation on the Ford pickup truck using a basis of $6,500 when their correct basis for depreciation purposes in the vehicle was $5,862. On the return for 1979 they also overstated their income from the sale of timber by $1,900 and failed to claim an excess in itemized deductions which when added to the interest and taxes shown on the farm schedule totaled $5,014.97. In his deficiency notice respondent determined that the $1,518 claimed in 1979 as a business loss from breaking bird dogs was not allowable because such loss had not been incurred in a transaction entered into for profit and that the expenses underlying the loss had not been substantiated. Respondent also disallowed the deduction of the $12,138 claimed as a loss from farming for the same reasons. OPINION On their 1979 return, petitioners claimed losses from Mr. Harris' farm operation as well as from his bird dog activities. In the deficiency notice respondent disallowed both losses, first, as having been incurred in activities "not engaged *516 in for profit" and secondly, as not being substantiated in amount. [3] Consequently, we must first determine whether the farming and/or the bird dog activities constituted activities engaged in for profit as contended by petitioners or activities not engaged in for profit as contended by respondent. If we conclude that one or both of such activities constituted an activity engaged in for profit, we must then determine the amount of deductions allowable with respect to such activity. We will consider each issue separately and in the order listed. Nature of Activities
Section 183(a)[4] provides that if an activity is not engaged in for profit no deduction is allowable with respect to such activity unless the deduction is otherwise allowable under section 183. Section 183(b)(1) allows those deductions such as interest and taxes which would be allowable without regard to whether or not such activity is engaged in for profit. Section 183(b)(2), provides that deductions *517 which would be allowable only if such activity is engaged in for profit shall be allowed but only to the extent "that the gross income derived from such activity for the taxable year exceeds the deductions allowable by reason of paragraph (1)." Section 183(c) defines an "activity not engaged in for profit" as "any activity other than one with respect to which deductions are allowable for the taxable year under section 162 or under paragraph (1) or (2) of section 212." The test for determining whether an activity is engaged in for profit is whether the taxpayer engaged in the activity with the primary purpose and intention of making a profit. Golanty v. Commissioner,72 T.C. 411 (1979), affd. 647 F.2d 170 (9th Cir. 1981); Allen v. Commissioner,72 T.C. 28 (1979). The taxpayer's expectation *518 of a profit need not be a reasonable one, but he must have an actual bona fide objective of making a profit. Dreicer v. Commissioner,78 T.C. 642 (1982), affd. without opinion 702 F.2d 1205 (D.C. Cir. 1983). The issue of whether the necessary intention is present is a question of fact to be determined from all of the relevant facts and circumstances and with the burden of proof being upon the taxpayer. Golanty v. Commissioner,supra at 426; Allen v. Commissioner,supra at 34. In making the determination with respect to intent we must give greater weight to objective facts than to the statement of intent by the taxpayer. Engdahl v. Commissioner,72 T.C. 659 (1979). In section 1.183-2(b), Income Tax Regs., some of the factors which are to be considered in determining whether an activity is engaged in for profit are set forth. These factors, which have been derived primarily from prior cases, are as follows: (1) the manner in which the taxpayer carries on the activity, *519 (2) the expertise of the taxpayer or his advisors, (3) the time and effort expended by the taxpayer in carrying on the activity, (4) the expectation that assets used in the activity may appreciate in value, (5) the success of the taxpayer in carrying on other similar or dissimilar activities, (6) the taxpayer's history of income or losses with respect to the activity, (7) the amount of occasional profits, if any, which are earned, (8) the financial status of the taxpayer, and (9) elements of personal pleasure or recreation obtained from the activity by the taxpayer. These nine factors are not exclusive and are to be applied in accordance with the facts of each case. Furthermore, no one factor or even a majority of the factors is determinative. Golanty v. Commissioner,supra,Benz v. Commissioner,63 T.C. 375 (1974). [5]
In this case respondent argues that the objective factors which demonstrate that petitioners did not have a bona fide intent to make a profit in either the activity associated with *520 the farm or the activity associated with the bird dogs are: that neither activity was conducted in a businesslike manner; that there has been no demonstration that Paul H. Harris had any expertise in either activity; that the history of annual losses without any profits is a clear indication that an intent to realize a profit was not present; that the financial status of petitioners and their income from other sources are such that both the farm and dog training activities were carried on in order to provide a shelter for a portion of their income; and that Paul H. Harris "spends virtually all his free time either farming or working with bird dogs because he derives personal pleasure therefrom." We are unable to agree with respondent for the reasons set forth and discussed below: Respondent contends that petitioner failed to carry on the activities in a businesslike manner. We disagree and find that petitioner carried on his activities in a businesslike manner, keeping necessary financial records.Petitioner produced checks for the deductions claimed on the farm schedule with the minor exceptions noted in our findings. The checks contained notations such as farm supplies, labor, *521 feed, etc. Further, each of the checks bore the name of the payee. The scope of the recordkeeping was sufficient under the instant record for the activities that were carried on. According to respondent the best indication that Mr. Harris was not operating the farm "in a businesslike manner was the fact that he gave away a tobacco allotment to his son while continuing to pay certain expenses with respect thereto." The expenses which Mr. Harris admittedly paid with respect to the tobacco allotment were three checks totaling $55. The tobacco allotment was worth only about $600 per year and respondent fails to take into consideration the fact that Mr. Harris was already working from 7:00 in the morning until 10:00, 11:00, and sometimes even 12:00 at night and on weekends at the knitting mill, on the farm, and breaking bird dogs. Under these circumstances, it would have been difficult for him to have found the time to handle a 3,000 pound tobacco allotment. Furthermore, there is some evidence that the checks for $55 may have been issued by Mr. Harris in connection with a tradeoff for labor by the son. Under the circumstances of this particular case, we are unable to conclude that *522 the gift of the allotment to the son is an indication that the farm operation was not conducted in a businesslike manner. Further, as noted, we believe Mr. Harris' canceled checks and work sheets were sufficient herein for the activities that were conducted. On brief respondent admits that Paul H. Harris has a "knack" for training bird dogs and that he also has had some exposure to farm operations, but contends that there is no evidence in the record "that he has ever distinguished himself as an expert in either of these areas." Respondent goes on to contend that the succession of losses suffered by petitioners supports this conclusion, and that obviously Mr. Harris "spends virtually all his free time either farming or working with bird dogs because he derives personal pleasure therefrom." Mr. Harris admits that the enjoys farming and breaking bird dogs, and from his demeanor while testifying his enjoyment was readily apparent. It was equally apparent, however, that he is blessed with sufficient natural intelligence not to indulge in any activity requiring the time, money, physical effort and energy expended by him in farming and breaking bird dogs without expecting to generate *523 a profit. We found Mr. Harris to be a candid, honest, and totally believable witness, [6] and from his testimony we are satisfied that he has spent his entire life on and about farms and in daily association with farmers, and as a result, has acquired a great deal of knowledge and expertise in the field of farming. We are also satisfied that he engaged in farming with a genuine, honest, and bona fide intention of making a profit. *524 We are also satisfied that by 1977 Mr. Harris had acquired a great deal of experience and expertise in the breaking of bird dogs from the 25 to 30 years during which he had been raising, handling, training, and hunting with such animals, as well as from his observation of and association with other dog owners and handlers. From the record as a whole, we also believe that with his experience and expertise, and with the urging of other dog owners he undertook the bird dog breaking activity with an honest, sincere and bona fide intention of making a profit. In line with our conclusion that his nature would not permit him to engage in an activity with no objective of a profit, he quit breaking bird dogs at the end of 1979 because by then he had learned that in the time available he could not handle enough dogs to make the activity profitable. Substantiation of Expenses
With regard to this issue we have already noted that Mr. Harris inserted into the record checks in support of every deduction claimed in both activities except such noncash items as depreciation and certain very minor amounts deducted for telephone, utilities, and truck mileage. We have also previously noted *525 our satisfaction with Mr. Harris' testimony and the weight we believe it deserves. With his explanation, we are satisfied that his allocation of $6,000 in basis to the farm buildings, his estimate of truck mileage in connection with the dog activity and his proration of expenses between the farm and dog activities are all reasonable and should be allowed. With the substantiating checks we are also satisfied that the cash expenditures were made as claimed by him. Consequently, we conclude that the farm and bird dog deductions claimed by petitioners in 1979 should be allowed with the following exceptions: (1) The record contains no explanation for the telephone and utility expenditures and their disallowance by respondent is sustained. (2) As noted in our findings the total expenditure for feed contains three checks for hog feed. Since the only hogs raised in 1979 were slaughtered for personal use the checks identified as being for hog feed do not constitute farm expenses and are disallowed. (3) As stated in our findings, the correct basis for the pickup truck used by Mr. Harris is $5,862 and the deduction for depreciation on the truck will be adjusted accordingly. In connection *526 with the truck we also find that the farm deduction for gasoline and fuel should be reduced by $100 for the truck expense allocated by Mr. Harris to the dog activity and by $884 for his use of the truck to commute to Butner at 34 miles per day, five days per week, using the same mileage rate of 10 cents per mile as he employed in the dog schedule. (4) The deduction for farm labor is reduced by the amount of the three checks representing payment of labor in connection with the son's tobacco crop. With the above exceptions, the deductions claimed by petitioners on their 1979 return with respect to farming and the breaking of bird dogs are allowed as expenses incurred in activities engaged in for profit. Decision will be entered under Rule 155.
Footnotes
1. The parties stipulated that the farm was purchased in 1978. However, a full year of depreciation is claimed on the farm buildings on both the 1977 and 1978 returns, which indicates that the farm was purchased in 1977.↩
2. Similar droughts occurred in the same area during 1977, 1982 and 1983.↩
3. Interest and taxes included by petitioners in the farm losses were allowed by respondent as itemized deductions.↩
4. All section references are to the Internal Revenue Code of 1954, as amended and in effect during the years in issue, unless otherwise indicated. All rule references are to the Tax Court Rules of Practice and Procedure unless otherwise provided.↩
5. See also Fisher v. Commissioner,T.C. Memo. 1980-183, and Dennis v. Commissioner,T.C. Memo. 1984-4↩.
6. In fact, Mr. Harris brought to mind the statement of Thomas Jefferson that: Those who labour in the earth are the chosen people of God, if ever he had a chosen people, whose breasts he has made his peculiar deposit for substantial and genuine virtue. It is the focus in which he keeps alive that sacred fire, which otherwise might escape from the face of the earth. Corruption of morals in the mass of cultivators is a phaenomenon of which no age nor nation has furnished an example. * * * [G]enerally speaking the proportion which the aggregate of the other classes of citizens bears in any state to that of its husbandmen, is the proportion of its unsound to its healthy parts, and is a good enough barometer whereby to measure its degree of corruption. While we have land to labour then, let us never wish to see our citizens occupied at a workbench, or twirling a distaff. Carpenters, masons, smiths, are wanting in husbandry: but, for the general operations of manufacture, let our work-shops remain in Europe. * * * The loss by the transportation of commodities across the Atlantic will be made up in happiness and permanence of government. The mobs of great cities and just so much to the support of pure government, as sores do to the strength of the human body. It is the manners and spirit of a people which preserve a republic in vigour. A degeneracy in these is a canker which soon eats to the heart of its laws and constitution. [D. Malone, Jefferson the Virginian 384 (1948), quoting 3 The Writings of Thomas Jefferson 268-269 (P. Ford ed. 1892-1899).]↩