Anthony IMBESI and Hazel Imbesi, Petitioners,

v.

COMMISSIONER OF INTERNAL REVENUE, Respondent.

No. 15310.

United States Court of Appeals Third Circuit.

Argued Nov. 5, 1965.

Decided June 14, 1966.

Herman H. Krekstein, Philadelphia, Pa. (Merle A. Wolfson, Krekstein, Wolfson & Krekstein, Philadelphia, Pa., on the brief), for petitioners.

Edward I. Heilbronner, Dept. of Justice, Tax Div., Washington, D. C. (Louis F. Oberdorfer, Asst. Atty. Gen., Meyer Rothwacks, David O. Walter, Attys., Dept. of Justice, Washington, D. C., on the brief), for respondent.

Before STALEY and FREEDMAN, Circuit Judges, and COHEN, District Judge.

FREEDMAN, Circuit Judge.

The taxpayer [1] challenges the decision of the Tax Court sustaining the Commissioner's determination of income tax deficiencies totalling $177,452.44 which resulted from the disallowance of losses incurred in the years 1955 through 1959 in the breeding, training and exhibition of English Setter dogs and the breeding, training and racing of horses. The Tax Court in effect held that these activities of the taxpayer did not constitute a trade or business under § 165(c) (1) or transactions entered into for profit under § 165 (c) (2) of the Internal Revenue Code of 1954,[2] but were hobbies. The losses were

---

[1.] The husband will be referred to as the taxpayer, although his wife also is a party because they filed joint returns.

[2.] Section 165 provides:
  "(a) GENERAL RULE.—There shall be allowed as a deduction any loss sustained

held to be personal expenses under § 262,[3] and therefore not deductible.[4]

The Tax Court found these undisputed facts:

The taxpayer has been engaged in the manufacture, bottling and promotion of a soft drink popularly known as "7-Up" in the Philadelphia-New Jersey area since the 1930's. His initiative and skill has promoted the soft drink into a highly successful product. In the years involved— 1955 through 1959—he was the president of three and a partner in four "7-Up" bottling companies. He was also an active director in an advertising agency which dealt with the "7-Up" product, and was an officer and director in a realty company and in an apartment building venture. His salaries, director's fees and partnership distributions from the "7-Up" bottling companies during the years involved were large[5] and his director's and management fees from the advertising agency, the realty company and the apartment house were substantial.[6]

The taxpayer had owned and been interested in English Setter dogs since childhood. He considered the English Setter a beautiful, intelligent and "noble" animal and feared that the breed was declining in popularity as a sporting dog. He therefore determined sometime in 1934 that he would preserve and enhance the English Setter. This, in his own words, was the primary reason for his undertaking to breed them. While he was engaged in the breeding and selling of dogs, sometime in 1945 he decided to raise cattle for money-making purposes. He continued in this for about three years, but abandoned the enterprise because it was not profitable. In 1955 he realized that his dog breeding activities were likely to continue unprofitable and decided to enter the thoroughbred horse breeding and racing fields which he thought would yield large profits. At the time he had no familiarity with the sport, but he thought he would put to use in horse breeding and racing the knowledge he had acquired in his breeding and racing of dogs. During the years involved he owned twenty-five or thirty horses which were trained for racing by a public trainer. In 1960 he obtained a full-time trainer. In 1957 or 1958 he purchased property in New Jersey where he established his home and apparently his stables and kennels as well.

During the years involved the taxpayer kept no detailed books and records of the income and expenses relating to his dog and horse activities, and commingled the income from these sources with his general personal income in a single bank account from which he also paid out all expenses. At the end of each taxable year an accountant, who was the controller of

during the taxable year and not compensated for by insurance or otherwise.
* * * * *
"(c) LIMITATION ON LOSSES OF INDIVIDUALS.—In the case of an individual, the deduction under subsection (a) shall be limited to—
"(1) losses incurred in a trade or business;
"(2) losses incurred in any transaction entered into for profit, though not connected with a trade or business * * *."

3. Section 262 provides:
"Except as otherwise expressly provided in this chapter, no deduction shall be allowed for personal, living, or family expenses.

4. Anthony Imbesi, 23 T.C.Mem. 1678 (1964).

| 5. | 1955 | 1956 | 1957 | 1958 | 1959 |
|---|---|---|---|---|---|
| | $70,456.84 | $58,615.10 | $45,000.00 | $81,000.00 | $86,000.00 |

| 6. | 1955 | 1956 | 1957 | 1958 | 1959 |
|---|---|---|---|---|---|
| | $10,179.87 | $9,126.62 | $12,699.37 | $11,103.44 | $11,734.06 |

the "7-Up" bottling companies, made up worksheets of the income and expenses of the taxpayer's dog and horse activities taken from the taxpayer's bank statements and checkbooks. On the basis of these worksheets, which lumped together the dog and horse activities, a certified public accountant prepared the taxpayer's federal income tax returns. This record keeping was in marked contrast to the careful and detailed records kept by the "7-Up" bottling companies in which the taxpayer was interested, each of which had its separate bank account and detailed records of income, expenses, inventories, etc.

Beginning in 1943 to and including the years in issue the taxpayer claimed losses from cattle, dog and horse operations in generally increasing magnitude.[7] Until 1960 these activities showed no profit. There were small profits in 1960 and 1963 and large losses in 1961 and 1962.

The Tax Court found that the taxpayer's dog and horse operations were not carried on for profit but as personal hobbies and therefore disallowed the losses during the years involved. It is this conclusion which the taxpayer attacks as clearly erroneous.

■ The scope of our review of the Tax Court's decision is limited. Commissioner of Internal Revenue v. Duberstein, 363 U.S. 278, 80 S.Ct. 1190, 4 L.Ed.2d 1218 (1960), has established that not only the findings of fact but equally all the inferences the Tax Court draws from these findings are binding unless shown to be clearly erroneous. The principle which formerly had much vitality that a reviewing court is just as competent as the trial tribunal to determine what inferences should be drawn from the findings of fact no longer applies.

■ The Tax Court based its ultimate finding that the taxpayer's dog operation was not carried on for profit but as a personal hobby on his long-standing interest in English Setters, his admission that it was for this reason that he initially undertook their breeding, which he continued despite uninterrupted substantial losses, and on his informal accounting methods. We have carefully reviewed the record and cannot say that the Tax Court's conclusion was clearly erroneous.

■ The decision regarding the horse operation, however, is not free from clear error. Absent here, of course, was the important element which motivated him to undertake the breeding and exhibition of dogs,—his childhood love of English Setters. Despite this difference, the Tax Court relied on the reasoning which it followed in regard to the taxpayer's dog operation with the added findings that the taxpayer had failed to cull his unprofitable horses and had received no winnings from racing. The two findings

7. The following schedule sets forth the income, expenses, and losses claimed in petitioner's income tax returns for the taxable years 1943 to 1959, inclusive:

| Year | Income | Expenses | Loss |
|---|---|---|---|
| 1943 | $ 208.32 | $ 2,776.80 | $ 2,558.48 |
| 1944 | 322.89 | 5,078.87 | 4,755.98 |
| 1945 | None | 6,081.95 | 6,081.95 |
| 1946 | None | 7,337.22 | 7,337.22 |
| 1947 | 1,258.28 | 13,967.22 | 12,708.94 |
| 1948 | 5,111.88 | 16,470.02 | 11,358.14 |
| 1949 | 4,136.83 | 10,531.02 | 6,394.19 |
| 1950 | 4,478.35 | 17,895.71 | 13,417.36 |
| 1951 | 3,404.29 | 20,811.63 | 17,407.34 |
| 1952 | 7,462.07 | 24,880.96 | 17,418.89 |
| 1953 | 9,430.69 | 25,003.39 | 15,572.70 |
| 1954 | 7,591.46 | 27,096.75 | 19,505.29 |
| 1955 | 17,426.40 | 34,231.10 | 16,804.70 |
| 1956 | 18,005.01 | 58,553.43 | 40,548.42 |
| 1957 | 57,123.80 | 95,808.73 | 38,684.93 |
| 1958 | 92,524.50 | 140,726.31 | 48,201.81 |
| 1959 | 31,595.88 | 162,516.95 | 130,921.07 |

regarding culling and race winnings are clearly erroneous.

1. The Tax Court found that the taxpayer made no attempt to "cull" or dispose of unprofitable horses during the years involved. It considered this failure to be "inconsistent with the existence of a profit motive." This was a significant item in the Tax Court's ultimate decision. An examination of the record shows, however, that there is evidence, apparently not called to the Tax Court's attention, which makes it clear that the taxpayer did engage in culling. His income tax returns for the years in issue disclose that he sold ten horses at cost or less, which clearly indicates that he was reducing his losses by selling unprofitable horses. The Tax Court's finding that there was no culling of horses during the years involved must therefore be set aside.

2. The Tax Court found that during the years involved the taxpayer received no income from horse race winnings. The taxpayer calls attention, however, to track certificates in the record which show various winnings by his horses. He also urges that race winnings must be inferred from the record, because it is represented by the difference between his gross income and his income from the sale of horses. This we need not determine; it is a matter which the Tax Court may consider. It is clear, however, that the Tax Court's findings that there were no race winnings in 1955 through 1959 was erroneous.

These findings, of course, affected the ultimate decision of the Tax Court that the taxpayer's motive primarily was pleasure-seeking and not profit-making. There was, moreover, other evidence on the question of the taxpayer's motive to which the Tax Court failed to give adequate consideration.

The taxpayer testified that his motive in undertaking his horse operation was to make "big money." He said: "I wasn't making any gains with the dogs and I heard about the prices the thoroughbreds were bringing at the sales. So I decided to buy a couple of mares * * * I thought, there, would be the big money."

The Tax Court included the substance of this statement in its findings, but implied that its truth need not be considered, or if accepted, need not be given consideration, because it was uncorroborated and self-serving. While we do not believe the Tax Court meant to enshrine it as a principle that a witness's oral evidence if helpful to his claim will not be considered, and if believed is legally insufficient to prove his motive unless it is corroborated, nevertheless it evidently applied such a rule here by refusing to consider the taxpayer's testimony in drawing its ultimate inference as to his primary motive.

■ The error in this refusal was serious. The primary intent or motive of the taxpayer has always been the ultimate test for determining whether losses are deductible because incurred in a trade or business or in transactions for profit, or on the other hand are not deductible because they are personal expenses. See United States v. Gilmore, 372 U.S. 39, 44, 83 S.Ct. 623, 9 L.Ed.2d 570 (1963); Flint v. Stone Tracy Co., 220 U.S. 107, 171, 31 S.Ct. 342, 55 L.Ed. 389 (1911).

■ It is true that motive ordinarily is not put in issue. This is because the usual enterprise is surrounded by the conventional characteristics of a business or profession, and profit motive, therefore, is taken for granted. Indeed, it would seem an invasion of privacy to inquire whether a physician or a lawyer loved his work and engaged in it for pleasure, although cases may readily be called to mind of physicians and lawyers who remain devoted to their profession despite the greater financial reward their talents would bring them in commercial or industrial activities. Men of wealth may continue a business out of consideration of the welfare of their employees, or to carry on a family name, rather than to continue the accumulation of profits. In such cases the customary indications of a business enterprise so surround the activity that little thought arises of penetrating from the external appearance to the taxpayer's intention and motive in order to determine whether at its core there may

lie a pleasure-seeking or philanthropic motive which made the profit-seeking motive secondary. The reason for this, however, is not that motive is irrelevant, but that a predominant profit motive simply is assumed. Thus, the profit motive will be inquired into even though the activity has all the surface appearance of a business, if it is shown to have been arranged in a manner which fundamentally contradicts a profit-making purpose. See, e. g., Samuel Yanow, 44 T.C. 444 (1965), aff'd, 358 F.2d 743 (3 Cir. 1966).

Where the activity is not the taxpayer's principal means of livelihood and is of a sporting or recreational nature, then indeed, if he incurs losses in it, the question of motive becomes acute. The taxpayer is required to demonstrate that the appearance of a pleasure-seeking motive is misleading and that instead the motive for the activity was profit making.[8] The difficulty inherent in so elusive a test as motive has resulted in the search for objective guideposts.[9] The tax administrators have for many cases cut the theoretical knot by a practical regulation (§ 1.162–12) which permits the deduction of expenses incurred in a hobby to the extent of the income derived therefrom, although not permitting the deduction of losses. So it is that in practical effect the question of profit or business motive is eliminated from cases where expense but not loss is involved.

The Tax Court, in seeking to determine motive, appears to have directed its inquiry to objective indications such as record-keeping, the general profit-potential of the activity and the actual results achieved by the taxpayer, and to have excluded his direct testimony regarding his motive. Objective factors are, of course, valuable evidence of a tax-payer's motive, although these are often burdened with the same infirmity as a taxpayer's testimony, since the meticulous observance of details which have been labeled as important objective signposts is of doubtful value once their observance becomes self-conscious. Whatever its value, however, such evidence is merely a means of proof of the decisive element—the taxpayer's motive.[10] A taxpayer's direct testimony that profit-making was his primary purpose, although it suffers from the heavy burden of being self-serving, is not to be put aside without consideration simply because there exists other evidence of some objective circumstances. The evidence must be considered and evaluated as a whole.

It therefore follows that in a case of this kind where the trial tribunal's factual findings and inferences are final unless shown to be clearly erroneous, it must affirmatively disclose what disposition it made of so important a factor as the taxpayer's testimony of a profit motive. The Tax Court's decision does not do so.

It is of course impossible for us to determine the extent to which these errors affected the Tax Court's ultimate finding that the taxpayer's horse operation was a hobby. That the effect was substantial, is evident. The taxpayer is entitled to a decision by the Tax Court based upon an assessment of his testimony of his motive and a record freed from the clearly erroneous findings regarding the culling of horses and the absence of race winnings.

The decision of the Tax Court therefore will be vacated and the cause remanded for further proceedings not inconsistent with this opinion.

8. See cases collected in Note, Breeding Farms and Racing Stables—Hobby or Business?, 54 Ky.L.J. 92 (1965); 5 Mertens, Law of Federal Income Taxation (Rev. ed. 1963), § 28.72-§ 28.74.

9. See § 270, which limits loss deductions to $50,000 for each year, irrespective of motive, where losses exceed $50,000 in each of five consecutive years in a single trade or business.

10. Compare Commissioner of Internal Revenue v. Duberstein, 363 U.S. 278, 284–290, 80 S.Ct. 1190, 4 L.Ed.2d 1218 (1960), where the Supreme Court declined the government's invitation to substitute objective tests for the determination of donative intent.