JAMES R. STEELE and ELIZABETH A. STEELE, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Steele v. Commissioner
Docket No. 6299-79.
United States Tax Court
T.C. Memo 1981-118; 1981 Tax Ct. Memo LEXIS 624; 41 T.C.M. (CCH) 1092; T.C.M. (RIA) 81118; March 16, 1981. James R. Steele, pro se. Robert J. Burbank, for the respondent. FAY
MEMORANDUM FINDINGS OF FACT AND OPINION FAY, Judge: Respondent determined deficiencies in petitioners' Federal income tax for 1974 and 1975 of $ 2,222.83 and $ 2,746.76, respectively. The issues presented are whether petitioners' involvement in dog breeding and showing is an "activity not engaged in for profit" within the meaning of section 183[1] and, if such activity was engaged in for profit, whether petitioners are entitled to deductions greater in amount than those allowed by respondent. [2]
*626 FINDINGS OF FACT Petitioners, James R. Steele and Elizabeth A. Steele, were residents of Baton Rouge, La., when they filed their petition in this case. Some of the facts have been stipulated and are so found. Petitioner James R. Steele received a Masters degree in Dairy Science from Louisiana State University in 1967. His major field of study was animal breeding. In June 1969, he was employed by Gulf South Research Institute (GSRI) as a research analyst and was so employed during 1974 and 1975. Petitioner Elizabeth A. Steele was employed by South Central Bell Telephone Co. from 1971 through 1978. Sometime in late 1970, petitioners became interested in raising and showing dogs. James R. Steele "did a little economic feasibility study" and determined that, if everything went according to his calculations, he could start realizing profit in three years. The study consisted mostly of talking to dog breeders to determine the cost of dogs, the cost of shows, and where and how to market dogs. James R. Steele calculated that petitioners could get 12 puppies per year per female dog and should be able to sell the pet quality puppies for $ 300 to $ 400 if afghans and for $ 150 *627 to $ 300 if boxers. Out of each litter, he expected two puppies to be outstanding and to bring higher prices. For example, during 1974 and 1975, a championship quality afghan pup would bring from $ 400 to $ 800, and a championship quality boxer pup would bring about $ 350. In March 1971, petitioners had the GSRI art department design pedigree forms, a logo, "business" cards, and stationery for them using the name Lizan Kennels. At the same time, they established a bank account primarily for their dog breeding and showing activities. Canceled checks from that account served as petitioners' primary records. James R. Steele joined the Baton Rouge Kennel Club, the New Orleans Afghan Hound Society, and the Louisiana Boxer Club. Petitioners learned that championship quality dogs were more valuable than other dogs, and decided to show their dogs using a professional handler. The American Kennel Club (AKC) process for awarding championship status interested them. During 1974 and 1975, a dog needed 15 championship points including two "major" wins to be an AKC Champion. Championship points are acquired when a dog wins at an AKC-licensed show. The number of points earned by a *628 winning dog in each category of a show is based on the total number of dogs entered in each category in that show. As the number of dogs entered increases, the number of points the winner receives (one to five) also increases. A "major" win is a win in a show in which at least three points are awarded to the winning dog in each category. Petitioners raise two breeds of dogs--afghans and boxers. We will discuss them separately. Most, if not all, petitioners' dogs are AKC-registered. In 1971, petitioners bought three afghans--two females and one male. The first female, Dic-Mar's Lady in Blue of Lizan (Lady) who cost $ 625, was shown but won no AKC points. The second female, Dic-Mar's Pearl of Lizan (Princess), who cost $ 750, earned two AKC points. The male, Dic-Mar's Master Blue of Lizan (Blue), who cost $ 625, was shown more successfully. He earned six AKC points before developing a limp which ended his show career. The limp resulted from an inexplicable, uncorrectable vertebrae injury. However, Blue was not useless. He served as stud for Lady and Princess. Lady was bred with Blue in 1974 and had five puppies. Unfortunately, four of the five died because Lady had *629 "bad milk". Moreover, a delivery by cesarean section was necessary and the veterinarians felt Lady could probably only deliver one more time. Lady was sold in 1974 for $ 100.00. There is no evidence that any puppies resulted from breeding Princess with Blue. Princess was bred with an outside stud in 1972. According to the agreement signed when Princess was purchased, petitioners got to keep three of the resulting puppies. Two were sold and one, a male named Lizan's Silver Cloud (Cloud), was kept. Cloud was shown but received no AKC points. In 1975, petitioners bought a male afghan whose sire was the "winningest afghan in the United States". That male was sold for $ 450 when he was four years sold and only needed one "major" win to be a champion. He was sold because his coat had not developed as anticipated. At the time of trial petitioners owned Princess and her litter of eight pups. It is unclear whether or not petitioners still own blue or Cloud. When petitioners became interested in dog breeding, they already owned one female boxer, Miss Ritz, who was given to them in 1969. Miss Ritz was never shown. She was bred in 1971 and produced six pups, all of which died *630 because of "bad milk". She was bred again in 1973 or 1974 and only one pup, a female named Bit, lived. Bit was never shown. Miss Ritz developed cancer and was put to sleep. In 1972, petitioners brought one female boxer and one male boxer. The female, Hy-Court's Whispering Wind (Sissy), was shown and earned two AKC points. She had a uterus infection and required hormones to conceive. One successful breeding produced three pups--two of whom died and one of whom was put to sleep because its coloring was defective. Sissy developed a hip paralysis and was put to sleep in 1975 or 1976. The male, By-Crest Bad News of Lizan (Bad), was shown successfully. He won his Canadian championship in 1975, and had 16 AKC points and one major win when he contracted cancer and had to be put to sleep. Between 1971 and 1975, petitioners housed all their dogs in cages stacked in the living room of their home. During 1975, petitioners screened in their back porch and moved some of the dogs to that porch. The hours per day petitioners devote to their dogs varies. During 1974 and 1975, James R. Steele worked weekdays at GSRI from 8:00 a.m. to 5:00 p.m. He fed the dogs between 5:30 and 6:00 a. *631 m. and worked with the dogs two or three hours on weekday evenings and on weekends. Boxers need little supervision, but afghans must be paced and gaited to be successful show dogs. Petitioners' dog breeding and showing activities have not been profitable, as the following chart demonstrates: [3]
Deductions
Income From
Related to
Loss on
Other
Year
Dogs
Dogs
Dogs
Income
1971
$ 195.00h 2,846.62
$ (2,651.62)
$ 22,820.95
1972
475.00
4,567.68
(4,092.68)
25,447.75
1973
525.00
7,518.03
(6,993.03)
27,447.75
1974
1,250.00
8,394.73
(7,144.73)
30,786.19
1975
600.00
8,475.57
(7,875.57)
32,573.91
1976
25.00
7,268.46
(7,243.46)
35,901.43
1977
200.00
6,310.00
(6,110.00)
36,300.00
1978
416.62
6,714.19
(6,297.57)
41,881.24
The income petitioners realized from their dog breeding and showing activities resulted primarily from the sale of dogs and secondarily from stud fees. Petitioners advertised in some *632 publications, but we do not know the extent of such advertising. Sales during 1974 and 1975 were recorded on Lizan Kennels contract forms. Some sales were conditioned on the dog being spayed or on "Lizan" being part of the dog's name. The expenses petitioners claimed as deductions included show fees; veterinarian fees; travel costs; dog food costs; labor costs; depreciation on cages, dogs, a portion of petitioners' home, and a travel trailer used to attend shows; a portion of petitioners' home utilities; professional fees; advertisement fees; and the cost of supplies. In his statutory notice of deficiency, respondent determined that petitioners' involvement in dog breeding and showing was an "activity not engaged in for profit" within the meaning of section 183. Accordingly, he disallowed petitioners' losses with respect to that activity. As an alternate position, respondent determined that, if petitioners' activity was engaged in for profit, only part of the deductions claimed by petitioners would be allowable. OPINION The principal issue before us is whether petitioners' involvement in dog breeding and showing is an "activity not engaged in for profit" within the meaning *633 of section 183. If it is, then petitioners are not entitled to deduct losses with respect to such activity. Only if we determine that petitioners' activities are primarily profit-motivated, do we have to reach the issue whether petitioners are entitled to deductions greater in amount than those proposed by respondent. Respondent contends that petitioners' dog breeding and showing activities were not primarily motivated by hopes of profit. Respondent relies principally on the unbusinesslike manner in which the activity has been conducted and on the long history of losses incurred by petitioners. Petitioners maintain that they entered into the activity with he expectation of making a profit and that they still expect to make a profit. We agree with respondent that the activity was not engaged in for profit. Section 183(a) provides that no deduction attributable to an activity not engaged in for profit shall be allowed except as provided in section 183(b). Section 183(b) essentially states that losses in excess of income are disallowed with respect to such an activity. An "Activity *634 not engaged in for profit" is defined by section 183(c) as follows: For purposes of this section [183], the term "activity not engaged in for profit" means any activity other than one with respect to which deductions are allowable for the taxable year under section 162 or paragraph (1) or (2) of section 212. Thus, only if deductions would be allowable under sections 162 or 212(1) or (2) with respect to an activity, is that activity engaged in for profit. Section 162 deductions are allowed for trade or business expenses, while section 212(1) or (2) expenses are allowed for expenses incurred with respect to the production or collection of income or with respect to property held for the production of income. A common element of deductible section 162 expenses and deductible 212(1) or (2) expenses is a primary profit motive behind the activity with respect to which the expenses are incurred. Therefore, in essence, section 183 distinguishes between nondeductible hobby losses and deductible business losses, see S. Rept. No. 91-552, 91st Cong., 1st Sess. (1969), 1969-3 C.B. 423, 489, *635 and the ultimate fact to be determined is whether the primary reason for conducting an activity is to make a profit. Accordingly, in this case we must determine whether petitioners' primary motive for conducting their dog breeding and showing activities is to make a profit. Petitioners bear the burden of proof. Welch v. Helvering,290 U.S. 111 (1933); Rule 142(a), Tax Court Rules of Practice and Procedure. While ultimately we are deciding subjective intent, that intent can be ascertained from objective factors which are entitled to greater weight than a taxpayer's statement. See sec. 1.183-2(a), Income Tax Regs. Compare Engdahl v. Commissioner,72 T.C. 659 (1979), with Golanty v. Commissioner,72 T.C. 411 (1979). Section 1.183-2(b), Income Tax Regs., outlines nine factors to be considered along with all the other facts and circumstances in determining whether a dominant profit motive *636 exists. We shall discuss only those factors which are relevant to this case. First, if a taxpayer carries on an activity in businesslike manner, that may indicate an intent to realize profit. Sec. 1.183-2(b)(1), Income Tax Regs.; Golanty v. Commissioner,supra. In this case petitioners did not run a businesslike operation. The principal records kept by petitioners are canceled checks from a bank account set up primarily for the dogs. While those checks might serve as sufficient substantiation of expenses, they do not represent businesslike recordkeeping. No books were maintained to provide petitioners with an overall look at their business. Furthermore, no records were maintained with regard to each dog. Without such records, we fail to see how petitioners could possibly expect to evaluate their profit potential from breeding and showing dogs in any precise manner. [4]
While petitioners took some businesslike steps such as advertising, hiring a professional handler, and developing a name for their venture, we are not convinced that they operated *637 in a businesslike manner overall. Most of their actions are as compatible with dog breeding and showing as a hobby as with dog breeding and showing as a business. Second, when a taxpayer possesses or procures expertise in his activity, it is more likely that he has a profit motive. Sec. 1.183-2(b)(2), Income Tax Regs. For example, a study done prior to beginning an activity may indicate an intent to make money. In this case, petitioner James R. Steele had a background in animal breeding although it is unclear if he had any expertise with regard to dogs. He "did a little economic feasibility study" and estimated that profit would begin after three years if everything went according to his calculations. We find no indication that petitioners made any serious attempt to make things go according to those calculations. Petitioners estimated getting 12 puppies per female dog per year and estimated that two of those 12 pups would be of championship quality. However, the facts before us do not demonstrate any systematic breeding and sales activities. Petitioners' *638 primary source of income from this venture was to be from the sale of dogs. We were presented with evidence showing few breedings from 1971-1975. Furthermore, petitioners retained some poor breeders for years and failed to replace those disposed of. A study ignored is no better than a non-existent study. Third, when losses continue beyond what would customarily be a business's turn around point, the absence of a profit motive is indicated. Sec. 1.183-2(b)(6), Income Tax Regs.
Petitioners have sustained substantial losses from dog breeding and showing since 1971. Petitioner James R. Steele stated that after three years profits customarily would be realized in a dog breeding and showing business. Thus 1974 or 1975 should have been a profitable year. Neither was. This is not the type of speculative venture in which the expectation of large profits justifies substantial losses over a long period of time. As we said in Bessenyey v. Commissiner,45 T.C. 261 (1965), affd. 379 F.2d 252 (2d Cir. 1967), cert. denied 389 U.S. 931 (1967):
*639 [T]he goal must be to realize a profit on the entire operation, which presupposes not only future net earnings but also sufficient net earnings to recoup the losses which have mean-while been sustained in the intervening years. [45 T.C. at 274]. It is not enough that some profit is expected someday, profit sufficient to cover past losses must be expected. We cannot find that petitioners have or ever had such an expectation. Petitioners did suffer some misfortune with respect to ill and injured dogs, which perhaps increased their losses; but, as far as we can tell, they took no corrective measures. Furthermore, some of petitioners' bad luck probably could have been avoided by more extensive pre-venture research concerning problems in dog breeding such as the propensity of certain breeds to produce "bad milk." On the whole, the series of losses indicates that making a profit was not the petitioners' primary motive. Fourth, while profit seeking need not be the exclusive motive *640 for entering a business venture, the more elements of personal pleasure that a venture includes, the more likely that venture is a hobby. Sec. 1.183-2(b)(9), Income Tax Regs.
The breeding and showing of dogs has substantial recreational aspects. [5] A fondness for dogs and a desire for the personal satisfaction drawn from raising and showing championship dogs are motivations as likely as profit seeking. [6]
We have carefully considered all the facts and circumstances *641 in this case and cannot conclude that petitiners' dog breeding and showing activities were primarily motivated by hopes of profit. Petitioners did not operate their dog breeding and showing venture in a businesslike manner, they ignored their own feasibility study, a series of substantial losses were incurred, and their venture provided them significant personal pleasure. Petitioners have not opffered us proof sufficient to negate the nonprofit inferences to be drawn from those facts. Thus, we conclude that petitioners activity was "not engaged in for profit" within the meaning of section 183. Respondent's determination that the losses from petitioners' dog breeding and showing activity are not allowable deductions is sustained. Decision will be entered for respondent.
Footnotes
1. Unless otherwise provided, all section references are to the Internal Revenue Code of 1954, as amended. ↩
2. The second issue arises as a result of an alternate position taken by respondent in his notice of deficiency that, even if petitioners' activity is engaged in for profit, only part of the deductions petitioners claimed on their 1974 and 1975 Federal income tax returns are allowable.↩
3. All amounts are either taken from petitioners' Federal income tax returns or were stipulated except the "loss on dogs" amounts which result from subtracting "deductions related to dogs" from "income from dogs".↩
4. See Ballich v. Commissioner,T.C. Memo. 1978-497↩.
5. See Ballich v. Commissioner,supra n. 7; Imbesi v. Commissioner,T.C. Memo. 1964-276, affd. in part, vacd. and remd. in part, 361 F.2d 640↩ (3d Cir. 1966). 6. Petitioners devoted a substantial time to dog breeding and showing. However, when an activity has substantial personal or recreational aspects, a substantial investment of time is less convincing than it would be otherwise. See sec. 1.183-2 (b) (3), Income Tax Regs.↩