**Thomas C. BURGER and Marian E. Burger, Petitioners-Appellants,**

**v.**

**COMMISSIONER OF INTERNAL REVENUE, Respondent-Appellee.**

**No. 86–1585.**

United States Court of Appeals, Seventh Circuit.

Argued Oct. 28, 1986.

Decided Jan. 7, 1987.

David E. Gray, Bowers, Harrison, Kent & Miller, Evansville, Ind., for petitioners-appellants.

Richard J. Briscoll, Asst. Atty. Gen., Tax Div., Dept. of Justice, Washington, D.C., for respondent-appellee.

Before FLAUM and EASTERBROOK, Circuit Judges, and WILL, Senior District Judge.[*]

FLAUM, Circuit Judge.

The respondent determined deficiencies in the taxpayers' joint federal income tax returns for the years 1978–80. These deficiencies were assessed because the respondent determined that the petitioners' dog breeding operation was not an activity engaged in for profit under § 183 of the Internal Revenue Code. The respondent therefore determined that some of the taxpayers' losses were not deductible. The taxpayers filed a petition in the tax court for a redetermination of the deficiencies. A trial was held and the tax court upheld the deficiencies. The taxpayers appeal and we affirm.

## I.

The tax court's decision, *Burger v. Commissioner*, 50 T.C.M. (CCH) 1266 (1985), contains extremely detailed factual findings. We therefore set forth only those facts that are essential to understanding this case on appeal.

## A.

Sometime during 1973 or 1974, Dr. Thomas Burger, a surgeon, who was then 49 years old, discovered he was afflicted with Dupuytrens Contracture. This disease causes the fingers to become permanently clamped down to the palm. The disease would eventually progress so that Dr. Burger would no longer be able to practice surgery.

Aware of this affliction, Dr. Burger began to plan for his untimely retirement. The petitioners decided to breed dogs, because it was an activity they could do to-

gether, and it would permit them to move outside of the geographic area should they so desire. Although the petitioners had no experience with animal breeding, they began to set up their operation. The taxpayers contacted both an accountant and an attorney, the latter for advice as to possible zoning complications and the advisability of incorporating.

The taxpayers decided to breed Afghan hounds, and chose Shantoma as the name of their dog breeding operation. The taxpayers purchased three hounds from a Dr. Gerda Kennedy. One of these hounds, Kunasata, the taxpayers "finished to champion." [1] The taxpayers then decided to breed Kunasata. Dr. Kennedy had the right to provide the stud for the first three breedings. Kunasata came into season twice, but Dr. Kennedy failed to provide a stud. Consequently, the petitioners mated her with one of their own hounds. Kunasata whelped a litter of nine pups. However, the whelping caused her to suffer a ruptured uterus, and she required a hysterectomy. The petitioners retained the pups, hoping to keep the best ones for themselves. Eventually, the petitioners sold some of these pups. *Burger*, 50 T.C.M. (CCH) at 1268.

In 1977 the petitioners acquired a male Shih Tzu. Like Kunasata, the taxpayers finished this dog to champion. The petitioners then acquired two female Shih Tzu pups. Both of these females were later mated with the previously acquired male. Due to a genetic defect from inbreeding, however, the whelpings in late 1980 and early 1981 produced pups with physical deformities. Thus, once again the taxpayers suffered a setback beyond their control.

The petitioners operated the dog breeding operation out of their home. The petitioners made many capital renovations to both the inside and outside of their home. "In 1979, they purchased (for a room used as an office), an oriental rug for $3,550,

---

[*] The Honorable Hubert L. Will, Senior District Judge for the Northern District of Illinois, Eastern Division, is sitting by designation.

1. For a detailed description of how a dog is "finished to champion" and Kunasata's rise to fame, *see Burger,* 50 T.C.M. (CCH) at 1267–68.

Japanese prints for $700, and wallpaper for $240.... Additionally in 1980, they purchased (for the outside) urns, concrete statues, and a concrete Buddha for $1,034.50, and an oriental iron gate for $1,271.80, as well as various electrical appliances...." *Id.* They claimed all of the above as business expenses.

The petitioners attended over 20 seminars on dog breeding, and over 400 dog shows. These dog shows often included social events for the participants. For the purpose of attending these shows, the petitioners purchased a motor home. Because this motor home was used exclusively in connection with the dog breeding activities, the taxpayers deducted its cost as a business expense.

The most important facts for this appeal are Shantoma's financial records. These records consist of a ledger into which entries were made at the end of each calendar year. Dr. Burger's office manager at his medical office kept Shantoma's books.

The bookkeeping system employed for Shantoma was not as sophisticated as that maintained for the medical practice, which included daily, weekly, and monthly posting in a double entry ledger, financial statements, and computer generated balance sheets. Rather, the system used for Shantoma merely listed revenues and expenses ... it did not permit an analysis to be made as to the costs incurred for each dog, nor did it permit periodic assessment of the ongoing profitability of Shantoma's activities. *Id.* at 1269. The petitioners did not maintain a separate checking account for Shantoma, nor did they maintain a telephone listing for Shantoma.[2]

### B.

Petitioners, husband and wife, filed joint returns for the years 1978–80. The taxpayers filed their returns claiming Shantoma's losses as deductions. The respondent issued a Notice of Deficiency to petitioners on February 18, 1983, disallowing the deductions claimed by the petitioners in 1978, 1979, and 1980 for their dog breeding activity, because the respondent determined that the operation was not an activity engaged in for profit. In the alternative, respondent asserted that even if the activity was engaged in for profit, certain expenses (e.g. maintenance and repairs) were personal in nature and hence not deductible, and that an allocation was required between business and personal use for certain claimed depreciation expenses.

The taxpayers filed a petition in the tax court for a redetermination of the tax deficiencies assessed against them. On October 7, 1985, the tax court issued its Memorandum Opinion, in which it held that Shantoma was not an activity engaged in for profit within the purview of 26 U.S.C. § 183.[3] Consequently, the tax court did

---

**2.** A brief summary of petitioners' gross receipts and expenses is as follows:

|      | Alcoa Wages | Medical Net Earnings | Gross Receipts (Shantoma) | Expenses (Shantoma) |
|------|-------------|----------------------|---------------------------|---------------------|
| 1975 | $26,775.00  | $ 79,064.68          | $     0                   | ($13,702.00)        |
| 1976 | 30,797.30   | 90,831.44            | 0                         | ( 26,098.00)        |
| 1977 | 31,254.42   | 69,408.93            | 0                         | ( 48,299.06)        |
| 1978 | 32,504.42   | 85,070.61            | 0                         | ( 46,374.24)        |
| 1979 | 35,105.77   | 93,049.59            | 4,650.00                  | ( 59,249.11)        |
| 1980 | 37,676.48   | 108,937.74           | 3,890.21                  | ( 54,596.31)        |

Dr. Burger was, in addition to being a surgeon in a solo private practice, the part-time medical director for Aluminum Company of America ("Alcoa") at its Warrick, Indiana facility.

**3.** Section 183 provides in part:

(a) General rule. In the case of an activity engaged in by an individual or an S corporation, if such activity is not engaged in for profit, no deduction attributable to such activity shall be allowed under this chapter except as provided in this section.

(b) Deductions allowable. In the case of an activity not engaged in for profit to which subsection (a) applies, there shall be allowed—

(1) the deductions which would be allowable under this chapter for the taxable year without regard to whether or not such activity is engaged in for profit, and

(2) a deduction equal to the amount of the deductions which would be allowable under this chapter for the taxable year only if such activity were engaged in for profit, but only to the extent that the gross income derived from such activity for the taxable year exceeds the deductions allowable by reason of paragraph (1).

(c) Activity not engaged in for profit defined. For purposes of this section, the term "activity

not have to reach the respondent's alternative arguments. The petitioners appealed to this court, and for the reasons set forth herein we affirm.

## II.

■ Section 183 allows for the deduction of losses from activities engaged in for profit (i.e. business losses). Losses from an activity not engaged in for profit are generally deductible only to the extent of the gross income from that activity. *See Faulconer v. Commissioner,* 748 F.2d 890, 892–94 (4th Cir.1984).

The burden of persuasion under § 183 is on the taxpayer to show that he or she is engaged in the activity for profit. *Faulconer,* 748 F.2d at 893; *Nickerson v. Commissioner,* 700 F.2d 402, 404 (7th Cir.1983). A taxpayer's mere statement of intent is given less weight than the objective facts of the case. *Faulconer,* 748 F.2d at 894; *Nickerson,* 700 F.2d at 404.

## III.

### A.

Our review is limited to "whether the tax court was 'clearly erroneous' in determining that petitioners lacked the requisite profit motive." *Nickerson,* 700 F.2d at 404. "Clearly erroneous" means more than our conclusion that we would have reached a different result than the tax court; rather, "[a] finding is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire record is left with the definite and firm conviction that a mistake has been committed." *Anderson v. City of Bessemer City,* 470 U.S. 564, 573, 105 S.Ct. 1504, 1511, 84

L.Ed.2d 518 (1985) (*quoting United States v. United States Gypsum Co.,* 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1948)).

The petitioners argue that the tax court, by applying overly restrictive legal standards, was clearly erroneous in its interpretation of the facts. Petitioners assert that the tax court required them to show a reasonable expectation of profit and not merely a bona fide expectation. We reject petitioners' argument that the tax court applied the wrong legal standard.

It is well settled that a taxpayer's expectation of profit need not be reasonable; instead, only a good faith expectation of profit is required. 26 C.F.R. 1.183–2(a). The tax court stated that the "unlikelihood that Shantoma's revenues could ever exceed its substantial losses militates in favor of a finding that petitioners did not possess a profit objective." *Burger,* 50 T.C.M. (CCH) at 1272. We interpret the tax court's statement as expressing the belief that, in light of the mounting losses the petitioners were incurring, they could not, in good faith, possess a profit motive.

### B.

■ Whether a taxpayer has the requisite profit motive is a question of fact, to be determined by the tax court on the basis of all the facts contained in the record. *Engdahl v. Commissioner,* 72 T.C. 659, 666 (1979); *Sampson v. Commissioner,* 43 T.C.M. (CCH) 1408, 1415 (1982); *Ballich v. Commissioner,* 37 T.C.M. (CCH) 1851–40, –44. The tax court's determination is guided by nine factors to determine whether the activity is engaged in for profit or is a mere hobby.[4] 26 C.F.R. 1.183–1 to –4

not engaged in for profit" means any activity other than one with respect to which deductions are allowable for the taxable year under section 162 or under paragraph (1) or (2) of section 212.

26 U.S.C. § 183 (1982 & 1985 Supp.)

**4.** These factors are: (1) the manner in which the taxpayers carry on the activity; (2) the expertise of the taxpayers or their advisers; (3) the time and effort expended by the taxpayers in carrying on the activity; (4) an expectation that

the assets used in the activity may appreciate in value; (5) the success of the taxpayers in carrying on other similar or dissimilar activities; (6) the taxpayers' history of income or losses with respect to the activity; (7) the amount of the occasional profits, if any, that are earned; (8) the financial status of the taxpayers; and (9) the personal pleasure or recreation derived from the activity. 26 C.F.R. 1.183–2(b)(1)–(9). No one factor is conclusive. 26 C.F.R. 1.183–2(b).

(1986). We conclude that, guided by these nine factors, and viewing the facts and circumstances of the case, the tax court was not clearly erroneous in determining that the petitioners engaged in the dog breeding business without a bona fide profit motive. The petitioners must, therefore, pay the deficiency assessed against them.

The most relevant factors are the manner in which the taxpayers operated Shantoma, the taxpayers' lack of expert advice, the personal gratification the taxpayers received from Shantoma, and Shantoma's history of losses.

The bookkeeping system the taxpayers used for Shantoma is the most persuasive reason for concluding that Shantoma was a hobby and not a business activity engaged in for profit. See Ballich, T.C.M. (CCH) at 1851–44 to –45. The taxpayers posted Shantoma's books annually. The taxpayers cannot point to any evidence that demonstrates that they sought to decrease Shantoma's expenses or its mounting losses by use of a record system in which they could monitor costs monthly or even quarterly. We conclude, therefore, that because the taxpayers had no system to monitor expenses or losses, the petitioners could not make informed business decisions.[5]

The tax court has concluded that taxpayers who breed dogs, in order to maintain businesslike records, should maintain records of expenses as to each dog. See Burleson v. Commissioner, 46 T.C.M. (CCH) 1394, 1399 (1983); Steele v. Commissioner, 41 T.C.M. (CCH) 1092, 1095. We do not necessarily agree that expenses as to each dog must be maintained in all situations. Moreover, a taxpayer need not maintain a sophisticated cost accounting system. What a taxpayer should use is some cost accounting techniques that, "at a minimum, provide the entrepreneur with the information he [or she] requires to make informed business decisions. Without such a basis for decisions affecting the enterprise, the incidence of a profit in any period" would be wholly fortuitous, and losses would be expected. Burger, 50 T.C.M. (CCH) at 1271. See also Feldman v. Commissioner, 51 T.C.M. (CCH) 1412, 1416 (1986). Consequently, a taxpayer must show that he or she has instituted some methods for controlling expenses, and if losses are mounting, methods to control those losses. This is not impossible for a dog breeder to do. See, e.g., Harris v. Commissioner, 51 T.C.M. (CCH) 635, 640.

The second factor relevant to this case is the expertise of the taxpayers or their advisers. Taxpayers should not only familiarize themselves with the undertaking, but should also consult or employ an expert, if needed, for advice on how to make the operation profitable.

In this case, the taxpayers had no personal expertise, and did not make an effort to learn about the business end of the dog breeding operation. The petitioners consulted Dr. Kennedy, read books, and attended seminars. However, these activities concerned the mechanics of dog breeding and not the economics of the activity. Although petitioners consulted an accountant (about bookkeeping) and an attorney (about whether to incorporate), they did not consult economic experts in the field prior to engaging in the activity. The taxpayers' failure to consult economic experts or develop an economic expertise themselves is another fact that indicates a lack of a profit motive in this case.[6] See, e.g., Estate of Powers v. Commissioner, 46 T.C.M. (CCH) 1333, 1340 (1983), aff'd, 736 F.2d 826 (1st Cir.1984); Steele, 41 T.C.M. (CCH) at 1096;

---

**5.** This conclusion is supported by the fact that Dr. Burger had a sophisticated accounting system for his medical practice. Thus, the taxpayers were aware of accounting methods that a business might use to control costs.

**6.** We note that a formal market study is not necessarily required to make this determination. See Engdahl, 72 T.C. at 668. However, taxpayers should develop a plan or establish specific goals, either on their own or after consulting with an expert, outlining the profits expected to be reaped or the anticipated growth of the business activity. If no profits are ever expected, then the activity is clearly a hobby.

*Ballich,* 37 T:C.M. (CCH) at 1851–45; *Benz v. Commissioner,* 63 T.C. 375, 385 (1974).

The third relevant factor is the personal pleasure or recreation the taxpayers derived from the activity. The tax court concluded that the taxpayers received a great amount of personal gratification from Shantoma. The tax court also noted that the petitioners desired recognition in the dog breeding community. We note that recreation or personal recognition, rather than profit, may be the sole motive of a taxpayer to engage in an activity. However, the goal of recognition can be quite consistent with a motive for profit; after all, a good businessperson would want people to know that he or she has a fine product. We do not believe, as the government implied at oral argument, that merely because a taxpayer enjoys an activity or seeks recognition from it, the taxpayer necessarily lacks a profit motive. *See, e.g., Cornfeld v. Commissioner,* 797 F.2d 1049, 1052 (D.C.Cir.1986). The importance of the personal pleasure a taxpayer receives can only be determined on a case-by-case basis.

In this case, the taxpayers did not deny that they received personal satisfaction and that they desired recognition among dog breeders. But the taxpayers point out that they spent many long, unpleasant hours taking care of the dogs.[7] We believe, however, that the tax court did not erroneously conclude that the personal gratification that the petitioners received from Shantoma, plus the social outlet the operation provided, demonstrated that personal gratification was the taxpayers' primary motive. Here the possibility of profit was small, yet

the taxpayers continued Shantoma. In fact, despite serious setbacks, some beyond their control, the petitioners continued attending dog shows and other events. Therefore, the tax court was not clearly erroneous in concluding from the facts here that the taxpayers engaged in the dog breeding operation out of a labor of love and not with an intent to make a profit. *See Jenny v. Commissioner,* 45 T.C.M. (CCH) 440, 450 (1983); *Ballich,* 37 T.C.M. (CCH) at 1851–45.

The final factor relevant to this case is the history of losses surrounding the petitioners' operation. The regulations provide that a continuous series of losses during the start-up stage will not necessarily be deemed indicative that the activity was not engaged in for profit. 26 C.F.R. 1.183–2(b)(6). The taxpayers assert that their losses were all attributable to the start-up stage.[8]

We disagree with the petitioners. By the end of 1980, their cumulative losses totaled over $239,000, and for the three years in question the amount was over $150,000. The taxpayers hoped to generate revenues by selling puppies for $2,000 apiece, and the dogs they finished to champion for thousands more. They showed no objective of making a profit, however, because the taxpayers never considered expenses, either at the aggregate or at the individual dog level. Moreover, the taxpayers made no effort to control expenses or make changes in their operation. Clearly the losses, which were mounting at $40,000–$50,000 annually, continued beyond the

---

7. For example, the time and effort dealing with sick animals and mucking out the cages.

8. The taxpayers also argue that they were confronted by unforeseeable and unavoidable problems such as the loss of Kunasata's breeding capacity. We agree with the tax court when it stated that:

Although there were fortuitous circumstances beyond the control of petitioners, such as the delay in the breeding of Kunasata because of the inability of Dr. Kennedy to provide a stud and the ruptured uterus that Kunasata suffered, it was not shown that had these events not occurred, Shantoma nevertheless would have been profitable. [For example, i]n the

best of circumstances, were Kunasata to have whelped a litter of nine pups by the middle of 1977 and remained healthy, petitioners still would not have been able to surmount their already substantial losses through the sale of such a hypothetical 1977 litter and all subsequent litters that might have been whelped by a healthy Kunasata. The unlikelihood that Shantoma's revenues could ever exceed its substantial losses militates in favor of a finding that petitioners did not possess a profit objective.

*Burger,* 50 T.C.M. (CCH) at 1272 (footnotes omitted).

start-up stage of the operation and beyond the point in which the petitioners could reasonably expect a profit. *See Powers,* 736 F.2d at 830; *Steele,* 41 T.C.M. (CCH) at 1096. Thus, if the taxpayers maintained Shantoma for profit, logic dictates that they would desire to recoup all of Shantoma's past losses; yet, the record shows no effort by petitioners to accomplish this goal.

### IV.

We conclude that the tax court was not clearly erroneous in holding that the petitioners did not undertake their dog breeding activity with the objective of making a profit. Factors such as the taxpayers' unbusinesslike records, Shantoma's large losses, the personal gratification the petitioners derived from Shantoma, and the probability that Shantoma would never yield a profit, all operate against the petitioners' assertion that they had a bona fide motive of making a profit.

We hold, therefore, that the petitioners' dog breeding activity was not engaged in for profit under § 183. The tax court's judgment is AFFIRMED.