T.C. Memo. 1999-116

UNITED STATES TAX COURT

WILLIAM E. FLANAGIN AND BARBARA J. FLANAGIN, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 12585-97.                              Filed April 6, 1999.

William E. Flanagin, pro se.

<u>Joseph T. Ferrick</u>, for respondent.


MEMORANDUM FINDINGS OF FACT AND OPINION

VASQUEZ, <u>Judge</u>:  Respondent determined the following
deficiencies in, and accuracy-related penalties on, petitioners'
Federal income taxes:

| Year | Deficiency | Accuracy-related Penalty Sec. 6662(a) |
|------|------------|---------------------------------------|
| 1992 | $10,000    | $2,000                                |
| 1993 | 6,762      | 1,352                                 |

All section references are to the Internal Revenue Code in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure. The issues for decision are: (1) Whether William E. Flanagin's (Mr. Flanagin) software development activity was an activity engaged in for profit; and (2) whether petitioners are liable for penalties pursuant to section 6662 for 1992 and 1993 due to a substantial understatement of income tax.

FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulations of facts and the attached exhibits are incorporated herein by this reference. At the time they filed their petition, petitioners, husband and wife, resided in Illinois.

I. The Software Development Activity

Prior to and during the years in issue, Mr. Flanagin was a mainframe computer consultant. During this time, Mr. Flanagin also conducted an activity (the software development activity) that involved writing new software and trouble-shooting old software for use on the Zenith Z-100 computer (Z-100).

Zenith Data Systems (Zenith) first produced the Z-100 in late 1982. By this time, IBM had introduced the IBM personal computer (PC) and had taken the industry by storm. The Z-100 was non-PC compatible, and in 1986, Zenith stopped production of the

Z-100. Mr. Flanagin was aware that Zenith stopped production of the Z-100.

During the years in issue, a generous estimate of the total number of Z-100 users was a few thousand. Mr. Flanagin was aware of the limited number of Z-100 users.

A. The Floppy Disk Driver

In the late 1980's, Mr. Flanagin developed a floppy disk device driver (DiskPack) for the Z-100. He contacted Zenith to inquire whether it was interested in this software. Zenith informed Mr. Flanagin it was not interested in DiskPack.

Zenith referred Mr. Flanagin to Paul Herman (Mr. Herman) who owned Paul Herman, Inc. (PHI). PHI was a one-man, mail-order operation that distributed a newsletter (the Z-100 Lifeline) and Z-100 parts, products, and software to Z-100 users.

In 1988 or 1989, Mr. Flanagin contacted Mr. Herman. After some correspondence, Mr. Herman informed Mr. Flanagin that he (Mr. Herman) wanted to distribute DiskPack. In May 1989, Mr. Herman told Mr. Flanagin that he (Mr. Herman) had absolutely no way of knowing what the sales of DiskPack might be. Mr. Herman suggested a selling price of $39 with Mr. Flanagin receiving a 15-percent royalty on gross sales.

By August 1992, PHI had sold 250 units of the DiskPack program. In the fall of 1992, PHI offered an updated version of

DiskPack for $5. By April 1993, PHI had sold a total of approximately 300 copies of DiskPack.

During this time, Mr. Flanagin also worked on possible modifications to DiskPack so that it would work on PC emulators. The Z-100 Lifeline solicited interest in such modifications. By December 1992, only two people expressed interest in a PC-emulating version of DiskPack.

B. The SCSI Board

In November 1990, there was a get-together of Z-100 users. Approximately 50 people attended. A discussion among the attendees led to the suggestion that some of the more knowledgeable Z-100 users should attempt to produce a SCSI Host Adaptor (SCSI board) that would allow Z-100's to interface with Z-100 peripherals such as CD ROM's, tape backup units, and removable cartridge drives. Mr. Herman recruited four individuals, including Mr. Flanagin, to develop the SCSI board for the Z-100. Mr. Flanagin would develop the software necessary to run the SCSI board.

As of February 1991, Mr. Herman and the group had not determined how to finance, promote, or sell the SCSI board.

By mid-to-late 1991, the SCSI board project was nearly completed. Mr. Herman solicited orders for the SCSI board through the Z-100 Lifeline. The announced price was $249. At

this time, the Z-100 Lifeline's circulation was between 400 and 500 people.

In April 1992, PHI began shipping the SCSI board.  By August 1992, PHI had sold 45 SCSI boards.  In September 1993, PHI sold the remainder of the 60 SCSI boards.

During 1992 and 1993, Mr. Flanagin also attempted to develop software that allowed additional drivers to be used with the SCSI board.

II.  Other Background Information

Mr. Flanagin kept receipts for the various computer-related expenses he incurred in conducting his software development activity.  He kept no other books and records of financial information.  Mr. Flanagin did not maintain a budget or financial projections for his software development activity.  He kept no records of projects undertaken or hours worked on specific projects.  Mr. Flanagin never prepared any marketing or financial plans or projections.  At no time did Mr. Flanagin undertake any study of what costs he might incur in attempting to develop working software for the SCSI board.

Petitioners deducted expenses related to the software development activity on Schedule C of their tax returns. Petitioners reported the following income, receipts, and expenses:

| Year | Nonsoftware Activity Income | Software Activity Gross Receipts | Software Activity Expenses |
|------|------|------|------|
| 1989 | $67,889 | $0 | $5,917 |
| 1990 | 102,224 | 1,178 | 5,484 |
| 1991 | 104,780 | 0 | 10,405 |
| 1992 | 156,773 | 248 | 31,318 |
| 1993 | [1]63,838 | 94 | 24,908 |

[1]  This is the amount Mr. Flanagin reported on his 1993 original separate return.  An amended return was filed for 1993; however, it was not made part of the record.  The amended return reported more taxable income than the original return and additional tax due.  We believe, therefore, that in 1993 Mr. Flanagin's nonsoftware activity income was at least $63,838.

Since 1984, petitioners annual gross receipts from the software activity never exceeded $1,200.

Petitioners reported losses from the software development activity were as follows:

| Year | Loss |
|------|------|
| 1984 | ($11,237) |
| 1985 | (6,643) |
| 1986 | (11,565) |
| 1987 | (5,365) |
| 1988 | (2,038) |
| 1989 | (5,917) |
| 1990 | (4,306) |
| 1991 | (10,405) |
| 1992 | (31,070) |
| 1993 | (24,814) |

OPINION

I.   The Software Development Activity

Section 183(a) provides generally that, if an activity is not engaged in for profit, no deduction attributable to such activity shall be allowed except as provided in section 183(b). Section 183(c) defines an "activity not engaged in for profit" as "any activity other than one with respect to which deductions are

allowable for the taxable year under section 162 or under paragraph (1) or (2) of section 212."

For a deduction to be allowed under sections 162 or 212(1) or (2), a taxpayer must establish that he or she engaged in the activity with an actual and honest objective of making an economic profit independent of tax savings. See Antonides v. Commissioner, 91 T.C. 686, 693-694 (1988), affd. 893 F.2d 656 (4th Cir. 1990); Dreicer v. Commissioner, 78 T.C. 642, 644-645 (1982), affd. without opinion 702 F.2d 1205 (D.C. Cir. 1983). The expectation of profit need not have been reasonable; however, the taxpayer must have entered into the activity, or continued it, with the objective of making a profit. See Hulter v. Commissioner, 91 T.C. 371, 393 (1988); sec. 1.183-2(a), Income Tax Regs.

Whether the requisite profit objective exists is determined by looking to all the surrounding facts and circumstances. See Keanini v. Commissioner, 94 T.C. 41, 46 (1990); sec. 1.183-2(b), Income Tax Regs. Greater weight is given to objective facts than to a taxpayer's mere after-the-fact statement of intent. See Thomas v. Commissioner, 84 T.C. 1244, 1269 (1985), affd. 792 F.2d 1256 (4th Cir. 1986); sec. 1.183-2(a), Income Tax Regs. Petitioners bear the burden of proof. See Rule 142(a).

Section 1.183-2(b), Income Tax Regs., provides a list of factors to be considered in the evaluation of a taxpayer's profit objective: (1) The manner in which the taxpayer carries on the

activity; (2) the expertise of the taxpayer or his advisers; (3) the time and effort expended by the taxpayer in carrying on the activity; (4) the expectation that assets used in the activity may appreciate in value; (5) the success of the taxpayer in carrying on other similar or dissimilar activities; (6) the taxpayer's history of income or loss with respect to the activity; (7) the amount of occasional profits, if any, from the activity; (8) the financial status of the taxpayer; and (9) elements of personal pleasure or recreation.  This list is nonexclusive, the number of factors for or against the taxpayer is not necessarily determinative, and more weight may be given to some factors than to others.  See sec. 1.183-2(b), Income Tax Regs.; cf. Dunn v. Commissioner, 70 T.C. 715, 720 (1978), affd. 615 F.2d 578 (2d Cir. 1980).

Petitioners contend that the losses from the software development activity are properly deductible because the activity was profit motivated.  Conversely, respondent asserts that the activity was not engaged in for profit.  We agree with respondent.

A.  Manner in Which the Activity Is Conducted

The fact that a taxpayer carries on the activity in a businesslike manner and maintains complete and accurate books and records may indicate a profit objective.  See sec. 1.183-2(b)(1), Income Tax Regs.  A taxpayer ordinarily should use some accounting techniques that, at a minimum, provide the taxpayer

with the information required to make informed business decisions. See Burger v. Commissioner, 809 F.2d 355, 359 (7th Cir. 1987), affg. T.C. Memo. 1985-523. Without such a basis for decision, any profit would be fortuitous, and losses would be expected. See id.

Mr. Flanagin did not make any written forecasts or projections of future income. He conducted his activity unaware of the amount of revenue he could expect and had no concept of what his ultimate costs might be or how he might achieve any degree of cost efficiency.

Mr. Flanagin did not keep adequate records of the software development activity. The record demonstrates that Mr. Flanagin's actions were not businesslike and indicates that he lacked a profit motive.

B. Expertise of Mr. Flanagin

A taxpayer's expertise, research, and study of an activity, as well as his consultation with experts, may be indicative of a profit intent. See sec. 1.183-2(b)(2), Income Tax Regs. "Taxpayers should not only familiarize themselves with the undertaking, but should also consult or employ an expert, if needed, for advice on how to make the operation profitable." Burger v. Commissioner, supra at 359.

Mr. Flanagin had software writing experience; however, he was not knowledgeable about the economics of the activity. Mr. Flanagin did not seek professional advice on the economic aspects

of software development.  These facts do not persuade us that Mr. Flanagin had a profit motive.

C.  Elements of Personal Pleasure

The absence of personal pleasure or recreation relating to the activity in question may indicate the presence of a profit objective.  See sec. 1.183-2(b)(9), Income Tax Regs.  The mere fact that a taxpayer derives personal pleasure from a particular activity, however, does not, per se, demonstrate a lack of profit motive.  See Rinehart v. Commissioner, T.C. Memo. 1998-205.

Based on the record in this case, it appears to us that Mr. Flanagin enjoyed developing and debugging computer software programs.  Mr. Flanagin sent vendors working copies of software products he developed.  He testified that he was willing to take the risk that the software he developed would be stolen or might be utilized without receiving compensation.  We conclude that it was personal pleasure and satisfaction that drove Mr. Flanagin to spend his time and money developing software for an obsolete computer.  Accordingly, this factor weighs against petitioner.

D.  History of Income or Losses

A record of substantial losses over several years may be indicative of the absence of a profit motive.  See Golanty v. Commissioner, 72 T.C. 411, 426 (1979), affd. without opinion 647 F.2d 170 (9th Cir. 1981).  Mr. Flanagin suffered an uninterrupted history of losses from the software development activity from

1984 through 1993.  Mr. Flanagin's history of losses indicates a lack of a profit motive.

E.  Petitioners' Financial Status

Substantial income from sources other than the activity in question, particularly if the activity's losses generate substantial tax benefits, may indicate that the activity is not engaged in for profit.  See sec. 1.183-2(b)(8), Income Tax Regs. In 1992 and 1993, Mr. Flanagin had nonsoftware activity income of at least $156,773 and $63,838, respectively.  Mr. Flanagin could afford to operate the software development activity as a hobby. This factor indicates a lack of profit objective.

F.  Other Factors

Mr. Flanagin knew that the useful life of the Z-100 was nearing its end.  Petitioners argue, however, that Mr. Flanagin's work relating to the Z-100 was laying the foundation for developing PC-compatible software.  At the trial, Mr. Flanagin testified that he had no evidence to support this contention. Even if Mr. Flanagin had been attempting to move into the PC-compatible market, the aforementioned factors still weigh against petitioners.

G.  Conclusion

After reviewing the entire record, we conclude that Mr. Flanagin did not engage in the software development activity with

an actual and honest objective of making a profit within the meaning of section 183.

II. <u>Accuracy-Related Penalty for a Substantial Understatement</u>

Respondent determined that petitioner is liable for the accuracy-related penalty for 1992 and 1993 because there were substantial understatements of income tax on petitioners' 1992 and 1993 Federal income tax returns. See sec. 6662(a) and (b)(2). An "understatement" is the difference between the amount of tax required to be shown on the return and the amount of tax actually shown on the return. See sec. 6662(d)(2)(A). A "substantial understatement" exists if the understatement exceeds the greater of (1) 10 percent of the tax required to be shown on the return for a taxable year, or (2) $5,000. See sec. 6662(d)(1). The understatement is reduced to the extent that the taxpayer has (1) adequately disclosed his or her position or (2) has substantial authority for the tax treatment of an item. See sec. 6662(d)(2)(B). Petitioners have the burden of proving they are not liable for the penalty. See Rule 142(a).

Petitioners make no arguments regarding the accuracy-related penalty. Based on the record, we conclude that there was a substantial understatement of income tax in each of the years in issue, and respondent's determination is sustained.

To reflect the foregoing,

<u>Decision will be entered</u>

<u>for respondent</u>.