RUFUS C. BURLESON AND MARY F. BURLESON, Petitioners, v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Burleson v. Commissioner
Docket No. 4897-81
United States Tax Court
T.C. Memo 1983-570; 1983 Tax Ct. Memo LEXIS 215; 46 T.C.M. (CCH) 1394; T.C.M. (RIA) 83570; September 15, 1983. *215 Held: Petitioners activity consisting of breeding, training, showing, boarding and grooming dogs was an activity engaged in for profit. Consequently, their losses from such activity were deductible. John D. Copeland, for the petitioners. Helen T. Repsis, for the respondent. DRENNEN
MEMORANDUM FINDINGS OF FACT AND OPINION DRENNEN, Judge: Respondent determined the following deficiencies in petitioners' Federal income tax: Taxpayer
Year
Deficiency
Rufus C. Burleson
1976
$8,131.37
Mary F. Burleson
1976
4,668.00
Rufus & Mary Burleson
1977
16,962.00
Rufus & Mary Burleson
1978
22,565.00
After concessions, the sole issue is whether petitioners are entitled to deduct losses incurred in their breeding, showing, boarding and grooming of dogs. FINDINGS OF FACT Some of the facts have been stipulated and are found accordingly. The stipulation of facts and exhibits attached thereto are incorporated herein by reference. Petitioners Rufus C. Burleson (Petitioner) and Mary F. Burleson (Mary) resided in Dallas, Texas at the time the petition was filed herein. Petitioners filed separate returns for the taxable year 1976, and joint returns for 1977 and 1978. From 1957 to 1971, petitioner was employed in various *216 positions in the construction industry in Dallas. Petitioners began breeding and showing boxer dogs in the 1960's. Sometime in the early 1960's, petitioners conceived a plan to operate a large commercial dog kennel. From 1965 to 1971 they lived in a farm house in a rural area, where they constructed a kennel and boarded a small number of dogs commercially. They sold this property in 1971 at a substantial profit when, because of the city's growth, it became apparent they could not maintain a dog operation there. In 1971, they moved to a ten acre property in a rural area of Denton County. They purchased a prefabricated home and constructed a small kennel there. Sometime after moving to Denton, petitioners reached a tentative agreement with two other individuals to form a corporation called "Kennel Kare" to operate a commercial kennel on the Denton property. [1] *217 The arrangement to form Kennell Kare, Inc. was never consummated, largely as a result of threatened litigation by owners of adjoining property. In 1971, after moving to Denton, petitioner quit his job in the construction industry in order to devote his complete attention to his dog activities. Simultaneously with the planing for Kennel Kare, he opened a dog grooming shop in the City of Dallas. The shop was operated under the name Mariburl Country Kennel. It consisted of a retail shop where dog supplies were sold, and a grooming room. The name of the business reflected petitioner's plans to use the shop as a pick-up point for dogs to be boarded at the proposed kennel on the Denton property. Petitioner expected that most of the profits would come from such boarding of dogs. Mariburl Country Kennel was petitioner's principal endeavor after he quit his job in the construction industry. He generally spent six days a week there. The shop employed several groomers. Petitioner advertised the business in national trade magazines, local newspapers and on local radio. He also consulted with owners of profitable kennels regarding the operation of such a business. Although petitioners were also breeding and showing boxers during these years, their work [2] did not permit them to attend many dog shows. *218 They attended shows occasionally on weekends but hired professional handlers to train and show their dogs. Petitioner initialy incorporated Mariburl County Kennel, but allowed its corporate charter to lapse in 1973.Thereafter, petitioner operated the business as a sole proprietorship until he sold it in 1978. Petitioner used a simple "one-write" accounting system, which consisted of cash receipts and disbursement journals. The business had its own separate bank account. Corporate tax returns were filed for Mariburl Country Kennel for fiscal years ending in 1972 and 1973. These returns showed an operating loss of $1,997.10 for 1972 and taxable income of $1,897.85 for 1973. No corporate returns for Mariburl Country Kennel were filed for later years. Although the corporate charter was forfeited in 1973, the operation of the business was not reflected in petitioner's Federal individual income tax returns for the years 1972 through 1979. [3] *219 No records of the operation of the shop during those years are available, although it appears that the shop incurred a net loss during that period. Due to the failure of Kennel Kare, petitioner was not able to board many dogs at Denton. However, he arranged for boarding services on a subcontract basis with two other individuals who had kennel facilities. [4]
Petitioners sold the Denton property at a substantial profit in 1973 after the plans for Kennel Kare fell through. They moved to their present home in North Dallas where they constructed several dog runs and converted a portion of the garage into a kennel. They continued their dog breeding and boarding activities at that location. They used a large upstairs room in the house as an office for managing their dog activities. In 1977, petitioner and Eileen Fox, who managed Marlburl Country Kennel, made plans for a joint venture to construct a large commercial dog facility on Fox's property. The *220 project would have included a kennel as well as training and showing facilities. They felt there was a market for such a facility based on their extensive experience breeding and exhibiting dogs.In addition, petitioner believed that his success and reputation in dog breeding and his experience in organizing dog shows [5] would provide a source of business opportunities for the enterprise. Although no formal contract was made, petitioner and Fox intended to form a partnership, with Fox contributing land and petitioner arranging for the financing. Petitioner prepared drawings of the proposed facility. He also prepared pro forma income and expense statements for the enterprise in which he projected gross income of at least $15,000 per year. A steel contractor submitted plans for the facility and estimated a construction cost of $244,000.Petitioner contacted several banks and savings and loan institutions, but was unable to obtain financing for the project, one reason being that the facility was designed for one use only. Throughout these years, petitioners continued *221 to breed and exhibit boxers with great success. Their dogs won many awards in national and international shows. One of their dogs, Marlburl's Joshua, won more shows than any boxer in history. Anoth dog, Marlburl's Rahab of Wesan (Penny), twice won best boxer in the United States and was featured on the cover of two national dog magazines. Petitioners' best show dogs were handled by professionals who were considered to be among the best in the business. [6] These dogs were not kept at petitioners' residence, but at facilities located where the professional handlers resided. Petitioners did not win cash prizes at dog shows. The sources of revenue from their breeding and showing were stud fees and sales of dogs. Petitioners sold some dogs on a part ownership or "lease" basis. The purchaser would pay half the cost of the dog in cash and take possession.Petitioners would retain a right to either a portion of the proceeds from sales of puppies, or to a certain number of puppies.This arrangement allowed petitioners to retain a financial interest in dogs that they could not physically accommodate on their property, *222 and at a lesser cost. In a kennel inventory analysis prepared in 1978, petitioners valued their top two prize-winning dogs at $25,000 and $15,000. Ten other dogs were valued in excess of $1,000. The accuracy of these valuations was supported by other testimony. Petitioners kept detailed records of their registered dogs. These records were required by the American Kennel Club, and contained information relevant to the purchase and sale and the breeding of the individual dogs. Petitioners advertised their boxers under the name "Marlburl Boxers." Their advertisements appeared in newspapers and in national trade magazines.
Through their success in exhibiting dogs, petitioners developed an excellent reputation in the national and international breeding world. Petitioner served as president of the Dallas Boxer Club and the Combined Specialty Clubs of Dallas. From the time petitioner commenced breeding and showing dogs, he had a long range goal of becoming a professional dog judge. The qualifications necessary to receive a judge's license from the American Kennel Club include success at breeding and showing. In 1981, petitioner applied for and was granted a license. Top judges can *223 earn $1,000 in a weekend. Petitioners paid the expenses of breeding and showing their boxers from their personal checking account. They did not maintain formal books or ledgers. Their accountant computed the schedules of business income and expenses attached to petitioner's tax returns from bank statements, check stubs, and invoices. For the years 1972 through 1978, petitioners claimed the following income and deductions from their dog breeding and showing: Year
Receipts
Deductions
Losses
1972
$360.
$9,375.
$9,015.
1973
6,010.
6,010.
1974
675.
8,985.
8,310.
1975
3,525.
13,992.
10,467.
1976
1,125.
17,834.
16,709.
1977
625.
24,156.
23,531.
1978
6,770.
30,991.
24,221.
Petitioners presented no records to substantiate the following expenses claimed for the years in issue: 1976
1977
1978
Automobile
$1,213.
$ 663.
$2,781 Telephone
540.
540.
Travel
1,558.
Total
$1,213.
$1,203.
$4,879 Since 1958 Mary was employed as a secretary by Elby Halliday Co., the largest real estate brokerage company in Dallas. She progressed in the company and was an executive during the years at issue. During the taxable years 1972 through 1978 Mary had total income from wages in excess of $700,000. From 1976 through 1978 her total income from wages was *224 $394,429. Rufus Burleson had no income from wages during any year from 1972-1978. In his notice of deficiency, respondent determined that petitioner's expenses in connection with his dog operations were incurred in activities not engaged in for profit within the meaning of section 183.[7] He therefore disallowed all expenses in excess of gross receipts. Alternatively, respondent disallowed the undocumented automobile, telephone, and travel expenses noted above. OPINION The primary issue is whether petitioner's dog activities constitute an activity "not engaged in for profit" within the meaning of section 183, in which case certain losses petitioner claimed from those activities are not allowable. Respondent argues that the activity was not engaged in for profit, nothing particularly the history of losses and the manner in which the activity was conducted.Petitioner contends that the breeding, showing, boarding and grooming of dogs was a business engaged in for profit. Section 183(a) provides that if an individual engages in an activity, and if that activity is *225 not engaged in for profit, then "no deduction attributable to that activity shall be allowed except as provided in this section." Section 183(c) defines an activity not engaged in for profit as "any activity other than one with respect to which deductions are allowable for the taxable year under sectio 162 or under paragraph (1) or (2) of section 212." The test for determining whether expenses are attributable to either a trade or business under section 162 or to the production or collection of income under section 212 is whether the taxpayer's primary intention and motivation was to make a profit from the activity. Jasionowski v. Commissioner,66 T.C. 312, 319 (1976). The taxpayer must have an actual and honest profit objective, but need not have a reasonable expectation of profit. Treas, Reg. section 1.183-2(a); Dreicer v. Com missioner,78 T.C. 642, 645 (1982), affd. in an unpublished opinion (D.C. Cir. Feb. 22, 1983). While the ultimate question is whether the taxpayer has an intent to make a profit, the determination of his motive is made by reference to objective standards, taking into account all of the facts and circumstances. Greater weight is given to objective facts *226 than to the taxpayer's mere statement of his intent. Treas. Reg. section 1.183-2(a); Dreicer v. Commissioner,supra at 645. The petitioner has the burden of proof to show that respondent's determination that the activities were not engaged in for profit is incorrect. Welch v. Helvering,290 U.S. 111 (1933); Rule 142(a), Tax Court Rules of Practice and Procedure.
Section 1.183-2(b), Income Tax Regs., lists some of the relevant factors to be considered in determining whether an activity is engaged in for profit. [8] *227 In denying petitioner's loss deductions from their breeding and showing of dogs, respondent relies principally on the manner in which the activity was conducted, and the history of losses from the activity. He contends that the petitioner conducted the activity in an unbusinesslike fashion, and that the losses sustained in every year of the activity indicate that they had no profit motive. Respondent also relies on the financial status of petitioners and the recreational aspects of the activity. [9] *228 *229 Petitioner argues that they conducted these activities in a businesslike manner as part of a successful "dog business" involving the commercial grooming and boarding as well as the breeding and showing of dogs. Although we find some substance in respondent's arguments, on the basis of the entire record before us, we conclude that petitioners had an actual and honest profit objective with respect to their dog business. The record in this case reveals a bona fide and persistent effort of petitioners, continuing over many years, to establish themselves at the pinnacle of the dog breeding world and to created a profitable business encompassing the various aspects of breeding, exhibiting and caring for dogs. The petitioners steady commitment to this enterprise, their consultatios with successful kennel owners and breeders, as well as their businesslike manner and their considerable achievements in exhibitions, manifest an honest profit objective and belie any characterization of their activities as a mere hobby or recreational *230 avocation. Of the factors listed in the regulations, we find the time and effort expended by Mr. Burleson to be of paramount significance. The evidence indicates that he spent six days a week at the grooming shop and kennels, which does not include additional effort required to care for his own dogs and arrange for their training and exhibition by professional handlers. Although respondent emphasizes the recreational aspects of breeding and showing dogs, the record indicates that few of petitioner's hours spent running his shop and caring for animals could be considered "recreational." Indeed, petitioners were able to attend few dog shows, due to time required in their respective occupations, and thus were deprived of most of the social and recreational benefits typically enjoyed by breeders of show dogs. See Engdahl v. Commissioner,72 T.C. 659, 670 (1979). In addition to managing Marlburl Country Kennel and exhibiting dogs, petitioner expended substantial time and effort in his attempts to expand his business into a large commercial kennel or combination kennel-show facility. He anticipated that his outstanding reputation in breeding and handling dogs would generate business for *231 such a facility and ensure the success of the enterprise. That these plans never reached fruition was due largely to circumstances beyond petitioner's control, rather than to any lack of preparedness or effort. [10]
Also of great significance is the fact that petitioner quit his employment in the construction industry in order to devote complete attention to his dog business. Section 1.183-2(b)(3) Income Tax Regs. provides: "A taxpayer's withdrawal from another occupation to devote most of his energies to the activity may also be evidence that the activity is engaged in for profit." Respondent argues that this fact is of little significance in light of Mary F. Burleson's substantial income from the real estate business, which removed the necessity of generating income from the dog business. While we agree that such an alternative source of financial support is an important factor to consider, the record in this case does not support respondent's characterization *232 of the dog activities as a hobby indulged in by a husband content to subsist on his wife's earnings. We do not agree with respondent's contention that petitioners conducted the activity in an unbusinesslike manner.Respondent relies principally on the fact that petitioners did not maintain a formal set of books and records or a separate checking account for the breeding and showing activities. [11] *233 See section 1.183-2(b)(1), Income Tax Regs. However, petitioners kept detailed records of their dogs, which were required by the American Kennel Club. Those records contained information sufficient to allow petitioner to determine the profitability of each dog. Cf. Steele v. Commissioner,T.C. Memo, 1983-63, cited by respondent. Moreover, the record indicates that despite the absence of formal books and records, petitioners maintained receipts, cancelled checks and invoices which were adequate for the purposes of their business.[12] We have indicated previously that the absence of a separate checking account and formal books and records does not necessarily indicate an unbusinesslike manner. Engdahl v. Commissioner,supra at 666. Respondent also relies heavily on the history of losses of the breeding activity. Section 1.183-2(b)(6), Income Tax Regs., states that a series of losses that extend beyond the start-up stage of an activity may indicate that the activity is not engaged in for profit. Petitioners incurred substantial expenses for raising, training and exhibiting their dogs, [13] *234 and reported losses ranging from $6,000 to $24,000 for each year between 1972 and 1978. Respondent contends that profits sufficient to recoup prior losses must be anticipated in order to demonstrate a profit motive, Besseyey v. Commissioner,45 T.C. 261, 274 (1965), affd. 379 F.2d 252 (2d Cir. 1967), and that this was not a reasonable expectation.
We reiterate that petitioner must demonstrate only an actual and honest profit objective, and is not required to show a reasonableexpectation of profit. Dreicer,supra. Despite the absence of profits during the years in question, we think that the hard work, businesslike manner, and persistent efforts to expand their operations indicate petitioners' intent to establish a profitable dog business. Moreover, the operating losses from the breeding and showing do not accurately reflect the total value of the enterprise. One of the factors listed in the regulations is the expectation that assets used in the activity may appreciate in value. [14] Petitioner prepared a kennel inventory in 1978 which showed the value of the two top prize-winning dogs to be $25,000 and $15,000. Ten other dogs were valued at $1,000 or more. The accuracv of these valuations was corroborated by other testimony. [15] Petitioners, by selling dogs on a co-ownership or lease basis, retained financial interests in a number of dogs which could reasonably be expected to produce *235 considerable income over time in the form of sales proceeds and stud fees. [16] *236 In short, we find that given petitioner's steadfast commitment to the dog business and their considerable achievements, the operating losses do not tell the whole story. [17] *237 On the record as a whole, we find that petitioner engaged in the dog activities with the primary objective of making a profit. Accordingly, they are allowed to deduct the losses in question. [18]
Decision will be entered under Rule 155.
Footnotes
1. In connection with this venture, an architect prepared plans for the proposed facility, and petitioner received bids from contractors for construction of the kennel, which ranged from $200,000 to $250,000.
2. From 1958 to the present, Mary has been employed full-time by a real estate firm.↩
3. This was apparently due to a misunderstanding between petitioners and the accountant who prepared their tax returns. As a result, the losses claimed for the years in question are attributable only to the breeding and showing of the boxers, and not to Mariburl Country Kennel.
4. Petitioner would transport the dogs from the shop to the kennels, and would split the boarding fees with the individuals involved.↩
5. Petitioner served as president and director of the Dallas Boxer Club, and in that capacity organized many dog shows.↩
6. As noted previously, petitioners did not attend many dog shows themselves.↩
7. All statutory references are to the Internal Revenue Code of 1954, as amended, and in effect during the years in issue.↩
8. These factors are: (1) the manner in which the taxpayer carries on the activity; (2) the expertise of the taxpayer or his advisors; (3) the time and effort expected by the taxpayer in carrying on his activity; (4) the expectation that assets used in the business may appreciate in value; (5) the success of the taxpayer in carrying on other similar or dissimilar activities: (6) the taxpayer's history of income or losses with respect to the activity; (7) the amount of occasional profits, if any, which are earned; (8) the financial status of the taxpayer; (9) elements of personal pleasure or recreation. The factors listed are not intended to be exclusive, and no one factor is determinative. 9. Respondent also argues that, for the purposes of determining whether petitioners had the requisite profit objective, the breeding and showing of dogs should be viewed as an activity which is separate from the operation of the grooming and boarding shop. Petitioner, on the other hand, argues that these activities are all part of one overall "dog business." Sec. 1.183-1(d)(1), Income Tax Regs. indicates that various undertakings of a taxpayer may be found to be separate activities, or may constitute a single activity. The regulation provides that all the facts and circumstances must be taken into account in ascertaining the activity or activities of the taxpayer. It further provides that the most significant facts and circumstances to be considered are the organizational and economic interrelationship of various undertakings, the business purpose for carrying on such undertakings either separately or as one activity, and the similarity of the various undertakings. The regulation states: "Generally, the Commissioner will accept the characterization by the taxpayer of several undertakings either as a single activity or as separate activities." Respondent argues, primarily because it was separately incorporated and had an independent checking account that Marlburl Country Kennel constitutes a separate activity. At trial, however, several witnesses testified as to the organizational and economic interdependence of these undertakings. Specifically, there appeared to be a substantial amount of customer overlap between Marlburl Country Kennel and Marlburl Boxers, and the advertising and goodwill of each activity generated benefits for the other. Petitioners plans to expand the kennel were based to a large extent on expected business from their contacts in breeding circles. However, we find it unnecessary to rule on this point since we find that the breeding and showing, whether viewed as a separate activity or as part of petitioner's overall dog business, was conducted with the requisite profit objective.
10. The plans for Kennel Kare, Inc. were thwarted by threats of litigation by adjoining property owners, and the joint venture with Fox to construct the kennel and show facility failed as a result of the inability to obtain financing.↩
11. Petitioners maintained a separate checking account for Marlburl Country Kennel, which was incorporated initially, but paid the breeding and showing expenses from their personal checking account. 12. Petitioner's accountant, who prepared their tax returns, testified that their records were better than most taxpayers in similar circumstances.↩
13. Well over half of petitioner's deductions claimed on their returns for the years in question were attributable to handling fees, entry fees, and advertising and promotion of their boxers. It is significant that petitioners employed top notch handlers, whose fees were believed to be justified by the tremendous success of petitioners' show dogs.
14. Treas. Reg. sec. 1.183-2(b)(4) provides: * * * (4) Expectation that assets used in activity may appreciate in value.↩ The term "profit" encompasses appreciation in the value of assets, such as land, used in the activity.Thus, the taxpayer may intend to derive a profit from the operation of the activity, and may also intend that even if no profit from current operations is derived, an overall profit will result when appreciation in the value of land used in the activity is realized * * * 15. Although respondent contests the validity of these valuations and asserts that they are supported only by "self-serving" testimony, we note that the values were corroborated by the testimony of two individuals with many years of experience in the dog business.Respondent offered no evidence to dispute these values. We found the testimony of these witnesses to be credible. ↩
16. We also think that, apart from the expected return on their investment in the form of stud fees and sales of dogs, the substantial goodwill created by petitioners' breeding achievements should enter into the "profit" calculus. Petitioners' prize dogs were featured on the covers of two national magazines, and they enjoyed an outstanding reputation in national and international breeding circles. Testimony indicated that this goodwill benefited Marlburl County Kennels and culd be expected to generate business for the proposed commercial kennel and show facilities.
17. Petitioners also argue that, considering the appreciation in value of the land used in the dog business, as well as the kennel inventory, they had a net economic gain from 1972 through 1978 of over $214,000. We have reservations about including the value of property used as a personal residence in such a computation, but petitioner's uncontradicted testimony was that each residential move he made was directly related to a need of his dog business. However, we find it unnecessary to rule on this point, as the factors we have discussed demonstrate a profit objective. 18. However, respondent argued alternatively that, if a profit motive is found, certain expenses claimed by petitioner were not substantiated. Petitioner has presented no evidence substantiating these expenses, and therefore, we disallow the deductions to that extent. T.C. Rule 142(a)↩.