T.C. Memo. 1997-503


UNITED STATES TAX COURT


DAVID E. AND CHERYL G. SMITH, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket No. 17071-95.                    Filed November 10, 1997.


<u>Jon R. Vaught</u>, for petitioners.

<u>Kimberley J. Peterson</u>, for respondent.


MEMORANDUM FINDINGS OF FACT AND OPINION

GERBER, <u>Judge</u>:  Respondent, by means of a statutory notice
of deficiency, determined the following income tax deficiencies
and section 6662(a)[1] penalties with respect to petitioners:

---

[1]Unless otherwise indicated, all section references are to
the Internal Revenue Code in effect for the years under
consideration, and all Rule references are to this Court's Rules
of Practice and Procedure.

|       |            | Penalty    |
| Year  | Deficiency | Sec. 6662  |
| 1990  | $11,276    | $2,255     |
| 1991  | 22,232     | 4,446      |
| 1992  | 36,483     | 7,297      |

By way of an amendment to respondent's answer, respondent sought increased deficiencies and penalties against petitioners under section 6214 for each of the years in issue, alleging that petitioner David Smith received taxable distributions from a pension plan under section 72(p) and (t). Respondent asserted that petitioners are liable for increased income tax deficiencies and section 6662 penalties of:

|       |            | Penalty    |
| Year  | Deficiency | Sec. 6662  |
| 1990  | $3,185     | $637       |
| 1991  | 13,939     | 2,788      |
| 1992  | 21,413     | 4,283      |

The increases result in combined income tax deficiencies and penalties in controversy as follows:

|       |            | Penalty    |
| Year  | Deficiency | Sec. 6662  |
| 1990  | $14,461    | $2,892     |
| 1991  | 36,171     | 7,234      |
| 1992  | 57,896     | 11,580     |

On brief, petitioners conceded that petitioner Mr. Smith received distributions from his pension plan taxable under section 72(p) and (t).[2] The following issues remain for our consideration: (1)

---

[2]However, petitioners have not conceded that they are liable for the increased sec. 6662(a) accuracy-related penalties asserted in respondent's Amendment to Answer.

Whether petitioners' dog-breeding activity during the taxable years 1990, 1991, and 1992 was engaged in for a profit; and (2) whether any underpayment of tax is due to negligence or intentional disregard of rules or regulations.

FINDINGS OF FACT

At all times relevant to this case petitioners were husband and wife and resided in Los Gatos, California. They filed joint Federal income tax returns for all 3 years at issue.

David Smith (Mr. Smith) is a medical doctor and was employed as a vascular surgeon during the taxable years at issue at Good Samaritan Hospital in San Jose, California. Mr. Smith generally worked 10 hours per day, 5 days a week as a physician. In addition, he was required to be "on-call" as a physician every third night and every third weekend. Cheryl Smith (Mrs. Smith) was not employed outside of petitioners' household during the taxable years at issue.

Mr. Smith received wages from his medical practice totaling $289,347, $278,419, and $242,960 for the taxable years 1990, 1991, and 1992, respectively. In addition to the wages, Mr. Smith received rental income from the leasing of medical equipment to Good Samaritan Hospital. His net rental income was $47,872, $51,957, and $38,405 for the taxable years 1990, 1991, and 1992, respectively. Petitioners also owned an agricultural

business named Madera Farm. Primarily, farm income was from the sale of figs and pistachios.

Petitioners first became involved in dog-showing activities in 1987 when they purchased their first show dog, a standard poodle. Although petitioners had no interest in dog-breeding activity in 1987, they built a kennel at their Los Gatos residence in order to care for a growing number of dogs. Petitioners became interested in dog-breeding activity during 1989, at which time they began to consult with dog breeders and research the subject of dog breeding. Mr. Smith also attended veterinarian seminars for dog breeders.

Petitioners, in addition to breeding standard poodles (a more common breed), decided to breed Portuguese water dogs (a rare breed) in the hopes of commanding higher prices. Their goal was to produce the highest quality dog possible. Mr. Smith did not prepare formal spreadsheets on the potential profitability of dog breeding, but he did estimate the annual potential to earn between $30,000 and $50,000 in gross receipts from dog breeding. Mr. Smith did not commit these estimates to writing. Petitioners did not consult with economic advisers or accountants prior to beginning their dog-breeding activity.

Petitioners placed their names on a waiting list and eventually received two Portuguese water dogs. Petitioners were

able to begin breeding their dogs in 1990.  They named their activity Dacher Kennel and began advertising in national dog-breeding magazines.  Petitioners paid thousands of dollars promoting the name of Dacher Kennel.  In addition, they hired professional handlers to show their dogs and to help establish their kennel's reputation.

During the taxable years 1990, 1991, and 1992, petitioners maintained approximately three adult dogs at their Los Gatos residence and 15 to 30 additional dogs at outside kennels.  Mr. Smith typically spent 8 to 10 hours per week performing various activities in keeping and caring for the dogs, including performing basic veterinary procedures.  Mrs. Smith typically spent approximately 12 hours per week caring for the dogs and spent an additional 12 hours per month in promotional activities related to dog breeding and showing.  For the first 3 weeks after puppies were born, petitioners had to be "on call" to care for the puppies 24 hours a day.

Mr. Smith kept track of expenses and revenues of the dog-breeding activity on his computer.  Petitioners, however, did not keep track of which of their dogs were profitable.  Although Mr. Smith maintained a separate checking account for Dacher Kennels, occasionally he used personal checks to pay for dog-breeding and showing activity expenses.

Petitioners achieved their goal of breeding high-quality dogs. One of petitioners' dogs, Dacher Gotta Get a Gun, won 21 best-of-breed competitions in 1992 and was also the 10th-ranked Portuguese water dog in the country that year. Unfortunately, petitioners' success at the shows did not translate into a profit-making activity.

Progressive retinal atrophy (PRA), a degenerative disease of the retina that causes blindness, began appearing in Portuguese water dogs in September of 1990. Within a year, the number of Portuguese water dogs diagnosed with PRA went from 2 to 42. However, Mr. Smith did not know that any of his dogs were afflicted with PRA until 1994.

Petitioners reported net losses from their kennel in the amount of $38,724, $69,629, and $109,795 for the taxable years 1990, 1991, and 1992, respectively. During that same period, petitioners reported gross receipts of only $5,055, $4,650, and $5,950, primarily from the sale of puppies and from stud fees.

Petitioners' losses were due primarily to the high cost of dog boarding and handling. In 1992, petitioners reported $88,700 in dog boarding and handling expenses. That amount constituted nearly 90 percent of the expenses associated with the dog-breeding and showing activity for 1992. In the notice of

deficiency, respondent disallowed the losses associated with the dog-breeding activity as not engaged in for profit.

OPINION

Issue 1.  Section 183

Initially we must decide whether petitioners' dog-breeding activity was not engaged in for profit.  Section 183(a) provides that individual taxpayers will not be allowed deductions which are attributable to an "activity * * * not engaged in for profit".  This term of art is defined in section 183(c) as "any activity other than one with respect to which deductions are allowable for the taxable year under section 162 [trade or business] or under paragraph (1) or (2) of section 212 [expenses incurred for the production of income]."  Section 183(b) permits deductions which would be allowable only if the activity were engaged in for profit, but such deductions may be taken only to the extent that any gross income generated from the activity exceeds deductions which are not dependent upon a profit objective (e.g., State and local taxes under section 164).

Although a reasonable expectation of profit is not required, the facts and circumstances must indicate that the taxpayer entered into the activity, or continued the activity, with the actual and honest objective of making a profit.  Keanini v. Commissioner, 94 T.C. 41, 46 (1990); Dreicer v. Commissioner, 78

T.C. 642, 645 (1982), affd. without published opinion 702 F.2d 1205 (D.C. Cir. 1983); sec. 1.183-2(a), Income Tax Regs.  In making this determination, more weight is accorded to objective facts than to the taxpayer's statement of intent.  Engdahl v. Commissioner, 72 T.C. 659, 666 (1979); sec. 1.183-2(a), Income Tax Regs.  Petitioners bear the burden of proving that they possessed the required profit objective.  Rule 142(a); Dreicer v. Commissioner, supra; Golanty v. Commissioner, 72 T.C. 411, 426 (1979), affd. without published opinion 647 F.2d 170 (9th Cir. 1981).

In determining whether an activity is engaged in for profit, reference is made to objective standards, taking into account all of the facts and circumstances of each case.  Sec. 1.183-2(a), Income Tax Regs.  The regulations set forth nine criteria normally considered for this purpose.  The factors are: (1) The manner in which the taxpayer carries on the activity; (2) the expertise of the taxpayer or his advisers; (3) the time and effort expended by the taxpayer in carrying on the activity; (4) the expectation that assets used in the activity may appreciate in value; (5) the success of the taxpayer in carrying on other similar or dissimilar activities; (6) the taxpayer's history of income or losses with respect to the activity; (7) the amount of occasional profits, if any, which are earned; (8) the financial

status of the taxpayer; and (9) the presence of elements of personal pleasure or recreation. Sec. 1.183-2(b), Income Tax Regs. None of these factors is determinative, nor is the decision to be made by comparing the number of factors that weigh in the taxpayer's favor with the number that support the Commissioner. Id.

Petitioners argue that they had the requisite profit objective with respect to their dog-breeding activity. Conversely, respondent asserts that the activity was not engaged in for profit. We agree with respondent. Because the parties argued their respective cases by addressing each of the nine criteria enumerated in the regulations, we follow the same approach in our discussion.

1. Manner in Which the Activity Is Conducted

We begin by examining the manner in which petitioners carried on their dog-breeding activity. The fact that a taxpayer carries on the activity in a businesslike manner and maintains complete and accurate books and records may indicate a profit objective. Sec. 1.183-2(b)(1), Income Tax Regs. In deciding whether the taxpayer has conducted the activity in a businesslike manner this Court has considered, "whether accurate books are kept, whether the activity is conducted in a manner similar to other comparable businesses and whether changes have been

attempted in order to make a profit."  Ballich v. Commissioner,
T.C. Memo. 1978-497.

Petitioners assert that the fact that they utilized a
software program in order to keep track of expenses is evidence
that they carried on their dog-breeding activity in a
businesslike manner.  At trial, however, Mr. Smith admitted that
there were no records kept on which, if any, of his dogs in the
kennel were profitable.  Without such knowledge petitioners would
have no way of determining which dog or breed of dogs was
earning, or had the potential to earn, a profit.  The lack of
detailed records as to which dogs were or were not profitable is
an indication that the dog-breeding activity was not carried on
for profit.  Id.

Petitioners assert that their use of targeted advertising in
numerous trade magazines demonstrates that they conducted their
kennel in a businesslike manner.  However, petitioners did not
advertise in any local medium of general circulation.

Perhaps the most important indication of whether or not an
activity is being performed in a businesslike manner is whether
or not the taxpayer implements some method for controlling
losses.  Burger v. Commissioner, 809 F.2d 355, 359 (7th Cir.
1987), affg. T.C. Memo. 1985-523.  Mr. Smith asserts that he
attended veterinary seminars and performed basic veterinary

procedures in an effort to help keep down costs.  However, veterinary bills did not represent a significant portion of the activity's expenses.  The vast majority of expenses in connection with the dog-breeding and showing activity was for boarding and handling.  Petitioners made no attempt to reduce this expense.  To the contrary, the cost of dog boarding and handling increased precipitously from $19,102 to $88,700 from 1990 to 1992.  We conclude that petitioners did not operate their dog-breeding activity in a businesslike manner.

2.  Expertise of Petitioners

We next consider the expertise of petitioners with respect to their dog-breeding activity.  Sec. 1.183-2(b)(2), Income Tax Regs.  A taxpayer's expertise, research, and study of an activity, as well as his or her consultation with experts, may be indicative of a profit intent.  Id.

Mr. Smith met with breeders, attended seminars and read books on the subject of dog breeding.  In addition, his medical background, combined with his attending veterinary seminars, provided Mr. Smith with some knowledge of basic dog anatomy and medicine.  Nevertheless, the fact that Mr. Smith was "skilled in the art of dog breeding does not mean that petitioners began or continued their dog breeding activity for profit."  Glenn v. Commissioner, T.C. Memo. 1995-399, affd. without published

opinion 103 F.3d 129 (6th Cir. 1996). Significantly, petitioners did not seek professional economic or accounting advice on the economic aspects of breeding dogs. Other than Mr. Smith's rough estimation of potential gross receipts, they made no analysis or plan for earning a profit from breeding dogs, or even considered potential costs. Most important, they did not analyze or consult about the amount of expenses that they were likely to incur. The failure to seek professional advice is another factor that indicates a lack of profit motive. Burger v. Commissioner, supra.

3. Time and Effort Spent in Conducting the Activity

We next consider the time and effort spent by petitioners in conducting their dog-breeding activity. Sec. 1.183-2(b)(3), Income Tax Regs. The fact that the taxpayer devotes much of his personal time and effort to carrying on an activity, particularly if the activity does not have substantial personal or recreational aspects, may indicate an intention to derive a profit. Id.

The record indicates that Mr. Smith spent approximately 8 to 10 hours per week, and Mrs. Smith spent approximately 12 hours per week in keeping and caring for the dogs. Accordingly, we find that significant time and effort were spent by the couple in carrying on the activity. However, we also discern that

petitioners derived substantial recreational benefit from the time they spent with their dogs; therefore, this factor is generally neutralized.

4. <u>Expectation That the Assets Will Appreciate in Value</u>

Another factor is the taxpayers' expectation that the assets used in their breeding activity would increase in value. Sec. 1.183-2(b)(4), Income Tax Regs. Mr. Smith testified that in 1992 one of petitioners' dogs, Dacher Gotta Get a Gun, was the 10th-ranked Portuguese water dog in the country. In addition, petitioners, at the time of trial, owned the first- and second-ranked Portuguese water dogs in the country. Therefore, there is evidence that the value of some of the dogs in the kennel has appreciated. However, petitioners have failed to offer into evidence any records on the value of any of their dogs, or on the appreciation in value of their inventory of dogs during the years in issue. This paucity of evidence makes it difficult for us to determine whether petitioners had an expectation that the assets used in their activity would increase, or if they did increase, in value. See <u>Carson v. Commissioner</u>, T.C. Memo. 1990-508.

5. <u>Taxpayer's Success in Similar or Dissimilar Activities</u>

We next consider petitioners' prior experience in similar or dissimilar activities. Sec. 1.183-2(b)(5), Income Tax Regs. Although an activity is unprofitable, the fact that a taxpayer

has previously converted similar activities from unprofitable to profitable enterprises may be an indication of a profit motive with respect to the current activity.  Id.

Mr. Smith operated a successful medical practice, and although petitioners' farm showed losses during the first 3 years, it has since been profitable.  Petitioners had little prior experience in dog breeding and showing.  However, while prior experience may indicate that a taxpayer is engaged in an activity for profit, the lack of such experience does not necessarily indicate that the activity was not engaged in with the objective of making a profit.  Pirnia v. Commissioner, T.C. Memo. 1989-627; sec. 1.183-2(b)(5), Income Tax Regs. Accordingly, we find that this factor weighs in favor of petitioners.

6.  The Activity's History of Income and/or Losses

An important consideration is petitioners' history of income and/or losses with respect to their dog-breeding activity.  Sec. 1.183-2(b)(6), Income Tax Regs.  Losses continuing beyond the period customarily required to make an activity profitable, if not explainable, may indicate that the activity is not engaged in for profit.  Id.

By the end of the 1992 taxable year, petitioners had incurred more than $218,000 in losses from the dog-breeding

activity.  They used these losses to offset their substantial income from other sources.  Petitioners reported static gross receipts of $5,055, $4,650, and $4,950 for the taxable years 1990, 1991, and 1992, respectively.  The magnitude of the activity's losses in comparison with its revenues is an indication that petitioners did not have a profit motive with respect to the dog-breeding activity.  Burger v. Commissioner, 809 F.2d at 360.  In fact, petitioners' reported expenses for 1991 and 1992 were far greater than even petitioner Mr. Smith's estimates of the potential for gross revenues from dog breeding.

Petitioners assert that the reported losses were typical for the startup stage of any profit-making activity.  The record reveals, however, that the massive losses were not the result of expenses associated with the startup stage of a dog-breeding enterprise.  The losses during the first 3 years were not the result of purchasing breeding stock, or from building a kennel.  Petitioners had a kennel built on their property in 1987, 2 years before they became interested in the dog-breeding business.  The losses during the 3 years in issue were primarily the result of the cost of dog boarding and handling.  Dog boarding and handling expenses are not associated with the startup stage of a dog-breeding enterprise; in fact, these expenses are likely to grow as the size of petitioners' dog stock grows.  We therefore find

petitioners' argument that the losses were the result of startup expenses to be without merit.

In addition, petitioners assert that their losses were the result of "unforeseen or fortuitous circumstances * * * beyond * * * [their] control".  Sec. 1.183-2(b)(6), Income Tax Regs. Petitioners assert that the disease PRA caused an unanticipated increase in expenses in 1992 because they were required to purchase new stock for breeding.  This argument fails for two reasons.  First, PRA did not have a significant impact on petitioners' dog-breeding activity during the taxable years in question.  Petitioners did not know that any of their dogs even had PRA until 1994.  Second, as already noted, petitioners' losses were largely the result of the high cost of dog boarding and handling, and not from the purchase of breeding stock.

7.  Amount of Occasional Profits

The amount and frequency of occasional profits earned from the activity may also be indicative of a profit objective.  Sec. 1.183-2(b)(7), Income Tax Regs.  Given that petitioners have never reported a profit on their dog-breeding activity, we find that this factor supports a finding that the dog-breeding activity was not carried on for profit.  Glenn v. Commissioner, T.C. Memo. 1995-399.

8.  Financial Status of the Taxpayer

We next consider petitioners' financial status.  Sec. 1.183-2(b)(8), Income Tax Regs.  Substantial income from sources other

than the activity, particularly if the activity's losses generated substantial tax benefits, may indicate that the activity is not engaged in for profit.  This is especially true where there are personal or recreational elements involved.  Id.

Petitioners concede that their other business activities were successful and that this factor does not weigh in their favor.  The income of petitioners was substantial and was sufficient to enable them to maintain a comfortable standard of living notwithstanding the losses from the dog-breeding activity. In addition, petitioners were able to receive a substantial tax benefit from the deduction of these losses.  Therefore, the fact that petitioners had substantial income from outside sources, showing the lack of need to make a profit from the activity, supports a finding that petitioners did not carry on their dog-breeding activity for profit.  Golanty v. Commissioner, supra at 428-429.

9.  Elements of Personal Pleasure

The final factor is the personal pleasure derived by petitioners in conducting their activity.  Sec. 1.183-2(b)(9), Income Tax Regs.  Although the mere fact that a taxpayer derives personal pleasure from a particular activity does not mean that he or she lacks a profit intent with respect thereto, the presence of personal motives may indicate that the activity is not engaged in for profit.  This is especially true when there are recreational elements involved.  Id.

Petitioners concede that they derived personal pleasure from working with and showing their dogs. As this Court has stated, with respect to this factor:

> Unquestionably, an enterprise is no less a "business" because the entrepreneur gets satisfaction from his work; however, where the possibility for profit is small (given all the other factors) and the possibility for gratification is substantial, it is clear that the latter possibility constitutes the primary motivation for the activity. * * * [Burger v. Commissioner, T.C. Memo. 1985-523; fn. ref. omitted.]

Therefore, the fact that petitioners derived substantial personal pleasure from their dog-breeding activity supports a finding that the activity was not carried on for profit.

Considering all of the facts and circumstances, we find that petitioners have failed to prove that their dog-breeding and showing activity was engaged in for profit. Rule 142(a). Accordingly, respondent's determination in that regard is sustained.

Issue 2. Accuracy-Related Penalty Under Section 6662(a)

Respondent also determined that petitioners were liable for penalties under section 6662(a) and (b)(1) for each of the years in issue because petitioners were negligent for claiming deductions from their dog-breeding and showing activity. Section 6662(a) and (b)(1) imposes an accuracy-related penalty equal to 20 percent of the portion of an underpayment that is attributable to negligence or disregard of rules or regulations.

Negligence has been defined as "a lack of due care or a failure to do what a reasonable person would do under the circumstances." Leuhsler v. Commissioner, 963 F.2d 907, 910 (6th Cir. 1992), affg. T.C. Memo. 1991-179. Respondent's determination of negligence is presumed to be correct, and the taxpayer has the burden of proving that the determination is erroneous. Rule 142(a). Therefore, petitioners must prove that they were not negligent, i.e., that they made a reasonable attempt to comply with the provisions of the Internal Revenue Code, and that they were not careless, reckless, or in intentional disregard of rules or regulations. Sec. 6662(c); sec. 1.6662-3(b), Income Tax Regs.

We sustain respondent's determination. In determining whether petitioners were negligent in the preparation of their returns, we take into account petitioner Mr. Smith's business experience. Glenn v. Commissioner, supra. Additionally, the size of the tax losses claimed by petitioners in relation to the revenue earned from the dog-breeding and showing activity combined with the substantial enjoyment that petitioners derived from the activity created a situation that was "too good to be true" within the meaning of section 1.6662-3(b)(1)(ii), Income Tax Regs. Accordingly, petitioners are liable for the section 6662(a) penalties.

A different result must be reached with respect to the section 6662(a) penalties that respondent sought by way of an

increase in deficiency. Respondent bears the burden of proving the increases in deficiency and penalties asserted in his Amendment to Answer. Rule 142(a); Sproul v. Commissioner, T.C. Memo. 1995-207. Although petitioners have conceded that they are liable for the increase in deficiency, petitioners have not conceded that they are liable for the accuracy-related penalties asserted in respondent's Amendment to Answer.

Respondent has failed to sustain the burden of proving the penalties asserted in the Amendment to Answer. Respondent erroneously assumed on brief that petitioners had the burden of proof with respect to this issue, and therefore respondent presented no proof that petitioners acted negligently or intentionally disregarded the rules or regulations by failing to report taxable distributions from petitioner husband's pension plan. Accordingly, we hold that petitioners are liable for the accuracy-related penalties reflected in respondent's notice of deficiency, but not for the accuracy-related penalties resulting from the increases in the deficiencies.

To reflect the foregoing,

Decision will be entered

under Rule 155.